HENRY W. DOREMUS et al.

*v.*

THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON et al.

[Decided January 15th, 1908.]

1. In a suit by riparian owners against a city to enjoin the city from polluting the water of a river, unless compensation was made, evidence examined, and *held* to show that the city had not acquired a prescriptive right to pollute the stream.

2. A city is not responsible for so much of the street wash as goes into a stream from the surface of the streets, though more will in time of rain, on account of the paved surfaces preventing absorption by the soil, pass into the stream, but it is responsible for so much of the street wash as it by artificial means diverts into sewers emptying into the stream, for it then disposes of the matter thus diverted, as it disposes of household slops and the contents of closets.

3. A city may not, without making compensation for the property appropriated, collect water from a large area and by artificial means cast it on the lands over or through which it would not otherwise flow, to the injury of the owner thereof.

4. A city sued by riparian owners for damages for polluting a stream by emptying its sewage into it is not entitled to deduct a sum representing such injury as would have been inflicted by the city had it been without sewers, especially where it has not and cannot produce any evidence from which it will be possible to estimate such an allowance.

5. A harmful pollution of a water course is quite a different thing from "pollution" which consists merely in the presence even in considerable quantities of minerals held in suspension, or of minerals produced by chemical reactions, whose specific gravity causes them to sink quickly to the bottom.

6. In a suit against a city for polluting a water course by emptying its sewage into it, evidence *held* to show that the amount of polluted matter resulting from the sewage for which the city was liable was from two-thirds to three-fourths of the whole pollution of the stream.

7. Where, in a suit against a city to restrain it from polluting a river by emptying its sewage into it, unless it made compensation to the riparian owners for the diminution in value of their lands and property rights, the city answered by alleging that it elected to make such compensation to the riparian owners for the alleged diminution in value of their lands and property rights as should be ascertained to be just, and that the injury or taking was temporary, and was to continue no longer than a specified period, and the evidence showed that some years prior to the suit the waters of the stream had become sensibly and injuriously polluted, the compensation should not be computed as of the time of the filing of the bill, but should be awarded as of the time of the original taking.

8. The legal rule for compensation for the taking of land gives compensation for the value of the land at the time of the award of the commissioners, while the equitable rule gives compensation based on the value of the land at the time of the entry.

9. The act of a city in building sewers emptying into a stream and in discharging sewage into the stream as authorized by statute was not an invasion of the rights of riparian owners until the city began to pour into the stream more sewage than the stream could take care of, resulting in injury to the riparian owners.

10. A city built sewers emptying into a stream as authorized by statute. As soon as it became evident that riparian owners had a reasonable ground of complaint because of injuries resulting from the pollution of the stream they made application to the board of health of the city to abate the nuisance, and, failing there, they applied to the state board of health, and later to the legislature. After they had exhausted every other means of redress, they filed a bill to restrain the city from polluting the water.—*Held,* that the measure of compensation in lieu of equitable relief should be determined by the equitable rule of making compensation based on the value of the land at the time of the entry thereon by the city, and based on the fact that the injury was an entirety to be compensated for as such.

11. Under the Eminent Domain law a city may take a temporary use or interest in riparian land by discharging its sewage into a stream for a period of five years.

12. Where, in a suit against a city to restrain it from polluting the waters of a stream by discharging its sewage into it unless it made compensation to the riparian owners, the answer alleged that the injury was temporary, no allowance could be made for alleged depreciation in the

value of the lands of the riparian owners, nor for personal discomfort by the occupants thereof, and the measure of damages was the diminished annual value of the land.

13. The fact that owners of land fronting on a stream had given to another rights of flowage did not divest them of their ownership of the fee, and, subject to the servitude of flowage, they possessed the rights of riparian proprietors.

14. Where injury to real estate is only temporary and removable, depreciation in the market value of the land cannot be considered.

15. In a suit by riparian owners to restrain a city from polluting the waters of a river unless it made compensation for the diminution in value of their lands and property rights, evidence examined, and *held* to warrant the awarding of specified compensation based wholly on the diminution in the value of the lands and property rights.

On award and ascertainment of damages. Heard on pleadings and proofs.

*Mr. Sherrerd Depue* and *Mr. Charles L. Corbin,* for the complainants.

*Mr. Edmund G. Slalter* and *Mr. Michael Dunn,* for the defendants.

STEVENS, V. C.

This is a suit brought by twenty-five complainants against the city of Paterson. Its original object was an injunction to restrain the city from polluting the water of the Passaic river and from interfering with the enjoyment by the complainants of their rights as riparian owners. It was thought by the court of errors and appeals that in view of the delay in instituting the proceedings, and more especially in view of the magnitude of the injury that would result from prohibiting the use of the sewers to the people of Paterson, it would be inequitable to enjoin, if relief could be otherwise afforded. Justice Van Syckel said: "The relators are here asking equity and they must do equity. A substituted remedy by giving them adequate compensation for their injury would be a just disposition of the controversy." *Simmons* v. *Paterson, 60 N. J. Eq. (15 Dick.) 385.* At the close of his opinion, the learned judge thus expressed himself: "If these complainants amend their bill or file a new bill asking for an injunction unless the city will consent to make

such compensation for the diminution in the value of their lands as shall be ascertained to be just, such equitable relief can be given them. A court of equity will, to effectuate justice, settle unliquidated damages."

The complainants thereupon amended their bill and prayed for an injunction,

"unless and until the said defendant makes such compensation to your orators, respectively, for the diminution in value of their said lands and property rights as shall be ascertained by this honorable court to be just." .

The defendant has raised many objections to this proceeding. The decisions in reference to them will be found reported in *63 N. J. Eq.* (*18 Dick.*) *606; 65 N. J. Eq.* (*20 Dick.*) *711; 69 N. J. Eq.* (*3 Robb.*) *175, 188; 70 N. J. Eq.* (*4 Robb.*) *296.* The only one that bears upon the present inquiry is the last. The complainants in their bill stated their damages, "calculated upon the basis of said injuries being permanent." The defendants answered this statement so vaguely that application was made to strike it out. In passing upon the application, I said: "This statement necessitates a counterstatement by Paterson of whether it intends for an indefinite time in the future to pollute the waters of the Passaic, or whether it intends to stop polluting them within a definite period. If it intends to stop, it should so aver and it should designate a time beyond which the polluting will cease. Thus only can the complainants' damages be definitely ascertained, if the injury is to be computed on this basis." An order was accordingly made striking out that part of the answer for insufficiency. On appeal taken, the order was affirmed. The defendant finally answered as follows:

"This defendant elects, rather than submit to an injunction pursuant to the complainants' said bill of complaint, to make such compensation to the complainants, respectively, for the alleged diminution in value of their said lands and property rights in the said bill of complaint, more particularly mentioned and set forth, as shall be ascertained by this court to be just, so far as the court shall be held liable to make compensation for such diminution in value and subject to the same right, if any, to jury trial and appeal to the court of errors and appeals that defendants have in other suits in this court, and subject also to all valid or tenable defences cognizable in equity set up in this defendant's said original

answer. \* \* \* Such injury or taking (if any such injury there may be) is to be temporary, and is to continue no longer than five years from the date of the filing hereof."

It is upon this issue that proof has been taken.

Before I consider the rule of damages to be adopted and the application of the rule to the individual complainants, each of whose damages must be separately assessed, it will be conducive to a proper understanding of the case and of the difficulties involved in its solution if the general situation be explained.

Paterson contains within its corporate limits five thousand three hundred and fifty-seven acres. Of this, two thousand six hundred acres are now drained by sewers whose combined length is about seventy miles. These sewers are, except the Market street and the Thirty-third street sewers, chiefly constructed in the built-up, or western part of the city near the Great falls. The river itself encloses Paterson on the west, north and east. Bending sharply to the north, after flowing over the falls, it then turns south again. The distance, by way of the river, from the falls to Dundee lake, on which all but two of the properties of complainants lie, is about four miles, if the lake is to be considered as beginning at slack water near Thirty-third street. South of the river bank and between the falls and the Straight street sewer are the head and tail races of the society for useful manufactures, and along this stretch of territory, about a mile in length, are most of the factories, both those on the raceways and those along the river bank. The so-called Dundee lake is nothing more than the Passaic river somewhat widened by the construction of the Dundee dam. This dam was rebuilt and raised in the year 1869, and is situate just above the city of Passaic. The greatest width of the lake does not exceed eleven hundred feet, and through a large part of its length of three miles is scarcely wider than the original river, that is, from three to four hundred feet.

The flow of water past Paterson varies enormously. The Cook tables for 1904 and 1905 show that for three days in July, 1904, and for two days in July, 1905, there was no flow at all. What went into the river bed on those days was sewage and diluted factory waste. On the other hand, on one day in

March, 1904, the flow was nine thousand cubic feet per second, and on four days in March, 1905, over eight thousand. So great and sudden are the variations that averages would probably mislead. These conditions of flow have, to a certain extent, always existed, but they have, in recent years, been intensified by the withdrawal from the river at and above Little Falls of the water used by Newark, Jersey City, Paterson and other smaller towns. Jersey City is now using nearly forty millions of gallons daily, Newark about thirty-five millions and Paterson about ten millions. Of course, these figures would not justify the inference that the flow at Paterson was just so much less. The reservoirs that have been built in the upper waters of the tributaries modify the result. In dry weather, however, the abstraction of so much water from the stream does materially lessen the flow at Paterson.

The evidence shows that if sewage is diluted by a large volume of water, it is rendered harmless, except in so far as it may contain typhoid germs, and, possibly, the germs of one or two other diseases. These germs will live in pure water for several weeks, if not months. A single water closet along a stream, if it receives the *fæces* of a typhoid fever patient may dangerously contaminate the stream below and produce an epidemic. In the larger towns typhoid fever is nearly always present, and therefore the danger of pollution in the case of water used for drinking purposes, if taken out of the stream below the point of infection increases as the city grows. Leaving out of view this species of infection, it is said by Mr. Baldwin that it is usually estimated that it requires a flow of four cubic feet of water per second to take care of the sewage of one thousand people, assuming that the amount of sewage discharged is about one hundred gallons per capita. So diluted, water containing sewage to this extent is imperceptible to taste and smell. As illustrative of this rule, although Paterson constructed and used a system of sewerage in the early part of the decade, 1870 to 1880, Passaic took its drinking water from the river until 1882, and Jersey City took some of its water at a point just below Belleville until 1898. The point from which the Jersey City supply was taken was about eight miles below the Dundee dam.

Testing the capacity of the river to take care of the sewage
of Paterson by means of the formula, four cubic feet for one
thousand people, we get the following results:

The population of Paterson in 1905 was one hundred and
eleven thousand. Of this, in that year over ninety thousand
people used the sewers. Attributing one thousand gallons of
sewage to each person, there would be poured into the river
daily nine million gallons of sewage. To take care of this a
flow of ninety by four, or three hundred and sixty cubic feet
of water, would be required. Referring to the Cook tables, we
find that water in excess of that number of cubic feet flowed
past Paterson from January 1st, 1905, to May 27th, 1905, on
which day a flow of three hundred and thirty-six cubic feet are
recorded. From that time on the flow diminished. Only on
four days in June did it rise above three hundred and sixty
cubic feet. In July it did not average one-half of that figure
and never exceeds it. In August it was generally below it; in
September generally above it, and, in October, below it about
half the time.

In the stipulation of facts to be found on page 772 of the
printed case, it is agreed that

"the dilution necessary to prevent Paterson's sewage from becoming a
nuisance is taken to be not less than six cubic feet per second, flow of
water per 1,000 population."

This, I suppose, includes the factory waste that goes directly
into the river. It is rather an under than an overestimate.

It must be borne in mind that I gave given figures only for
a single year. In 1903, the flow appears to have been very much
greater; in 1904, somewhat greater in June and August.

In considering the situation, it must also be borne in mind
that the river, after flowing for from three to four miles, is ar-
rested by the water of the lake. The flow here being sluggish,
much matter is deposited. In the course of the last twenty
years the bottom of the lake has been filled with polluted mat-
ter to such an extent that islands have been formed. This
would have taken place to a much greater degree had it not been
for the extraordinary freshets which every now and then par-

tially cleanse the stream. The bottom and sides of the lake are covered with a black muck which is constantly undergoing septic action.

The complaint is that the water cannot be used for cutting ice, watering cattle, for drinking, for boating and for fishing, and that the stench proceeding therefrom and from the banks at low water is, at times, unbearable.

One of the contentions of the city is that the conditions which now exist prevailed to a lesser but considerable extent twenty years prior to the filing of the bill on December 30th, 1901, and that, therefore, to that extent, the city acquired a prescriptive right to pollute. This makes it necessary to consider the state of the river prior to 1881.

The Dundee dam was built in 1869. At that time the surrounding country was purely agricultural. Passaic was a mere village. It is admitted that the river and lake were, at that time, pure. Paterson appears to have laid one short sewer or drain just below the falls in 1859, but it was not until 1868 that it obtained full legislative authority to sewer in accordance with the comprehensive plan. Short sections were built in 1868 and 1869, but not very much work was done until 1872. In 1873, 1874, 1877, 1879 and 1880 the construction was continued and extensions have been made from time to time ever since. I do not find in the proofs any explicit reference to the ordinance which made connections with the sewers compulsory, but according to one of the witnesses it was not until 1887, that such an ordinance went into effect.

I stop for a minute to consider what must have been the conditions in 1870. At that time Paterson had a population of thirty-three thousand; less than one-third of its present population. It was largely built up around the raceways of the S. U. M. and around the corner of Market and Main streets as a centre. Most of the inhabitants used cesspools or vaults. A comparatively few used the Dark and Dublin spring brooks whose waters, according to the testimony, were very foul. I think it may safely be said that scarcely any of the water which went into the cesspools found its way, by percolation, through the soil to the river in a polluted condition. Unless the soil be unusually

31

porous, cesspools constructed fifty feet from a stream which is not subject to inundation, do not pollute it. The intervening soil acts as a filter. Taking this into account, considering the then population, and considering further that no water was diverted from the upper tributaries of the Passaic to furnish a water-supply to the municipalities below Paterson, it is not difficult to understand why the river, in a flow of nearly four miles, should have purified itself. The amount of water then flowing in the stream, even in dry summer weather, was abundantly able to take care of the small quantity, comparatively speaking, of domestic sewage and factory waste then going into it, either by way of polluted brooks or directly.

This condition of things did not undergo any considerable change during the decade ending in 1880. Paterson's population had, indeed, increased to fifty-seven thousand, but no water was then being diverted from the river for drinking purposes, and its volume was still sufficient, even in dry times, to take care of such impurities as found their way into it. The small amount of evidence to the contrary is contradicted by a mess of proof that seems to me conclusive. Perhaps, an exception, however, should be made of the gas works, a part of whose tar oil refuse did, at times, make itself manifest in the lake. But it was not sufficient to affect the water in any considerable degree. Convincing proof is to be found in the circumstance that the village of Passaic which, in 1880, had grown to be a town of six thousand five hundred people, continued to take its water-supply from the Dundee canal, or head race, as late as the year 1882. It was not until 1885 that the situation began, materially, to change. The lake had been a favorite place for boating and fishing. The last regatta was, according to one of the witnesses, held in 1884. Whether these regattas were thereafter discontinued because, as one of the witnesses testifying in behalf of the city says, of the disagreeable conditions or because, as another of them, testifying on the same side says, the members got married and the association disbanded, it is probable that after 1885 the lake, particularly at its upper end where the current met slack water, was not as free from objectionable impurities floating on the surface as it had been. Refuse from the slaugh-

ter-houses (now otherwise disposed of) and soap and oily sub-
stances proceeding from the dye works, occasionally, in times
of low water, were seen upon its surface. Keeping in mind the
ever changing volume of water flowing in it, and remembering
that in times of low water impurities would be more apparant
than in times of high, it is easy to reconcile the testimony of the
witnesses, scarcely any of whom fix, with certainty, either the
precise years when the pollution was apparent, the days when
they saw evidence of it or the periods of high or low water. It is
quite conceivable that in a dry time and in spots where there
was no current there may have been places above the Market
street bridge where bathing was disagreeable and yet it may be
true that the general character of the water lower down was still
fairly good.

By 1890 the population had grown to seventy-eight thousand.
It was between 1880 and 1890 that the silk-dyeing mills attained
to a position of importance, and it is admitted by all the wit-
nesses that the factory waste from these establishments was and
is far more objectionable than that from the locomotive works
or other foundries which had, up to that time, formed so pre-
dominating a part of Paterson's manufactories. The waste from
these dye works consists, in large part, of soap and of the gum
removed from the silk fibre, the latter of which, particularly,
is highly nitrogenous and quite as offensive, while undergoing
decomposition, as household sewage itself.

One of the complainants, Mr. Nash, bought his properties in
1887 and 1889. They lie on the west shore near the Dundee
dam, and therefore farthest away from the sewer outlets. He
says that the lake, at that time, was perfectly pure. That his
"folks bathed in it and hundreds of others bathed in it and
fished in it."

Another of the complainants, Richard Hoitsman, bought his
land in November, 1890. It lies on the east shore just above
the Market street bridge, and therefore somewhat over a mile
further up stream than the Nash property. Hoitsman says:

"Well, when I got there first, then, of course, as near as we could see,
there were little bubbles, but then it was more clear; the water was then
in some ways useful because we could fish in it and bathe in it.  *  *  *

We was boating more or less and there was a little steamer running through there from East Side park down to the cemetery, for five cents."

Still another of the complainants, Martha Phillips, whose property on the east side of the lake lies opposite that of Mr. Nash, bought in November, 1891. Her husband says that when he first went to live there there was no perceptible nuisance; that he inquired particularly about that before going there; that the water was then colored and had a slight odor, and that the river was not then used for bathing or fishing. Van Zaun says that the fishing stopped fifteen or sixteen years before he testified—that would be about 1890. Mr. Shriner, one of the city's witnesses, says that he caught fish in one of the lakes in 1883 or 1885. David Miller was the owner of a point jutting out into the lake and kept a boat-house there for twenty-eight or thirty years. He rented and took care of boats up to 1890. He says that before that the boating business was very good and that, up to that time you could catch any quantity of pickerel, black bass and yellow perch. Mr. Phillips says that after he went to live on the lake in November, 1891, the fish were dying for two or three years along the river banks, and in such large quantities that they were carried away under the direction of the board of health of Saddle River township. Mr. Gardner, the manager of the Dundee company, says that the water in the lake was in very good condition in 1880, the year in which he first took charge. On cross-examination he says he didn't think it was offensive so as to attract attention until along about 1885, when he thinks the Market street sewer was put in. But the records show that the Market street sewer was not put in until 1893. He says, further on, that at one time, which he ultimately fixes as being in 1890, or 1891, or 1892, after complaint made by Reed & Barry, manufacturers, who used the water, he noticed greasy substances under the ice, and after making an examination of them found they looked like the white of an egg. There are witnesses on the part of the city who testify to seeing impurities in the river above the lake, and in the lake itself, prior to 1890. These may well have been seen, in spots, in periods of low water, but they do not necessarily indicate that the lake, as a whole, was then in an objectionable or offensive condition. It must be

remembered that the growth in population, though continuous, was, from month to month, almost imperceptible; that the factories were becoming more numerous and were; as times went on, employing more hands. The ability of the river to take care of the slowly but constantly increasing pollution was becoming more and more taxed. More and more sediment was being deposited in the bottom of the lake, and at times of ordinary high water along its banks. It would be utterly impossible under these circumstances to fix any precise day when the river ceased to be pure and began to be offensive, and when the property owners began to have any tangible ground of complaint. High water or freshets might at any time carry off the collecting impurities. Still the evidence shows that scourings of this sort became less and less effective, and that islands began to form whose growth was progressive. If I accept the statements of Mr. Phillips the river was not offensive in the fall of 1891. Only two years before Mr. Nash had invested his money in additional land, after a residence on the lake of over two years.

I am inclined to fix the summer of 1892 as the time when the water had certainly become sensibly and injuriously polluted. The maxim *de minimis* would probably apply to the time previous. The fact that the people of Passaic had ceased to use the water for drinking purposes after 1882 is not significant. Typhoid germs are often present in water apparently pure. The danger from these germs began when the first householder built his privy higher up the banks of the stream. As the closets emptying into the river and into the sewers, which discharged into the river, became more numerous, so did the danger become greater. For this reason alone it was unsafe to use the water for drinking purposes. But even if the evidence showed that the city had begun sensibly to pollute the water in other respects as early as the year 1882, that would not help the defendant, for this suit having been commenced in 1901, a prescriptive right dating back twenty years would not have arisen.

The date that I have designated (June, 1902) finds some support in the testimony of Mr. Gardner, who says that in that year he rented the property now belonging to the Golf or Country Club, at a point on the upper end of the lake not far from slack

water, and that the stench was such that he had to take his family away.

It is justified to some extent by the records of sewage construction. As has already been shown a volume of water entirely capable of taking care of a small amount of sewage coming from a smaller number of sewers, may be inadequate to prevent a larger quantity coming from twice that number from becoming a nuisance. There were eleven sewer outlets in 1884 and twenty-one in 1892. The date fixed is nearly coincident with the building of the Market street sewer in 1893. This is the largest of Paterson's sewers, and empties its sewage into the middle of the lake itself. Its mouth is not far from a considerable number of the properties involved in this controversy. It must be remembered, however, that the very considerable territory which it drains is not thickly populated, and that in 1893 the amount of sewage which it discharged was not very great.

From 1893 on the evidence is convincing that the stream became more and more polluted and the odors more and more offensive, but with this qualification: a preceding dry season may have caused greater stench than a succeeding wet one, for, as I have already said, a given volume of water is capable of taking care of a given volume of sewage, and other things being equal the greater the flow the less the nuisance. Four causes have contributed to the constantly increasing evil—*first,* the growth of population; Paterson's population, 33,000 in 1870, had reached to 105,000 in 1900, and 111,000 in 1905; *second,* an increase in the number of factories and in the factory wasteage; *third,* an abstraction of water from the upper tributaries of the Passaic to supply the municipalities lower down; *fourth,* gradual increase in the amount of decaying or putrescent vegetable or animal matters deposited on the banks and bottom of the lake.

The city does not deny that it is under legal obligation to make some compensation for the injury inflicted. Its effort is to minimize the amount.

On this head the first contention is that it is not responsible for street wash. This is only true in part. The city is not responsible for so much of the street wash as goes into the river

from the surface of the streets, even though more would, in time of rain, on account of the paved surfaces preventing absorption by the soil in its natural state and causing occasional diversion of the natural flow, pass into the stream. *Bowlby* v. *Speer, 31 N. J. Law (2 Vr.) 351; Town of Union* v. *Durkes, 38 N. J. Law (9 Vr.) 2; Jussep* v. *Bramford Co., 66 N. J. Law (37 Vr.) 641.* I think it is, however, responsible for so much of the street wash as it, by artificial means, diverts into the sewers. It disposes of the matter thus diverted just as it disposes of household slops and the contents of water closets. It throws it at given points *en masse* into the stream, and so pollutes the stream just as household waste pollutes it. It pollutes it in a very different way from what it would if the droppings of animals and garbage were allowed to reach the river over the natural surface of the land. A moment's consideration will make this evident. Garbage and the droppings of animals cast upon the uneven ground, in its natural state are exposed to the action of the sun, the dews and the rain, and undergo chemical decomposition on or near the spot on which deposited. The gases generated pass off into the air; some of the solid portions of their changed condition are absorbed by the soil and taken up by vegetation, and only a residuum, largely mineral, finds its way first into the brooks and then from the brooks and rivulets into the river. Even in the brooks and rivulets it may undergo sedimentation and chemical change before reaching the stream. This action proceeds in summer weather when the river is generally lowest and therefore least able to take care of the foreign substances poured into it. How different is the progress of the same matters on paved streets, where a sprinkling cart or a light rain would at once carry them into the sewers, with whose current they would immediately enter the river. It seems to me that to this condition of things the rule enunciated in *Field* v. *West Orange, 37 N. J. Eq. (10 Stew.) 600,* is precisely applicable. It was there decided by the court of errors and appeals that a municipality may not, without making compensation for the property appropriated, collect water from a large area and by artificial means cast it upon the land over or through which it would not otherwise flow, to the injury of the landowner. See, also, *Soule* v. *Passaic,*

*47 N. J. Eq.* (*2 Dick.*) *29; Miller* v. *Morristown, 47 N. J. Eq.* (*2 Dick.*) *645; S. C., 48 N. J. Eq.* (*3 Dick.*) *645.* It is the action of the city in casting fæcal and other decaying or putrifying matters, in a body, through an artificial conduit, into the stream and thereby polluting it, and not the place from which they came, whether a water closet, a stable, or a gutter that gives rise to the actionable injury. The distinction between surface water, even though polluted, and sewage is obvious. In the former, the injury is nothing more than a consequence of the permission given by the law to fight what is called the common enemy. It is, in general, incidental and trifling. In the latter, it is serious, and often amounts to a deprivation, partial or entire, of the use or enjoyment of property.

The city's next contention is that the court ought not to give compensation for the whole injury inflicted, but should deduct therefrom a sum representing such injury as would have been inflicted by a city of the size of Paterson had it been without sewers. This contention is inconsistent with its position that it is not responsible for the injury inflicted by the factories that drain directly into the river. If it be not now responsible for those who pour their waste directly into the stream, neither would it be for the individual acts of each and all the inhabitants if they did the same thing. On what principle, then, could it offset the wrongful acts of individuals against its own wrongful act? If it is to be, so to speak, credited with the pollution caused by a multitude of individuals, then it must now be charged with all the pollution of all the factories draining directly into the river, in addition to that which is discharged from the sewers. But aside from this I venture to assert that no one could tell what deduction should be made. In view of the evidence given in this and the Jersey City water case I doubt whether the riparian owners would have suffered any actionable injury had every householder been provided with a cesspool situated not less than forty or fifty feet from the stream; assuming, of course, that the contents of the cesspools were not afterwards dumped into the river. It is admitted that Dundee lake was a body of pure water before the sewers were built, though Paterson then had a population of over thirty

thousand. The reason was that the soil itself took care of the
sewage in the cesspools and so far as complainants are concerned
(I do not, of course, refer to the people of Paterson), there is
no reason why the soil should not, for a considerable number of
years, have taken care of a much larger amount, for the increas-
ing population would, of course, have extended itself over new
territory, and the new cesspools would have been opened in new
soil. Then, again, it is quite likely that the absence of sewers
would have materially interfered with Paterson's growth. The
city has not produced, and could not produce, any evidence
from which it would be possible to estimate such an allowance.

The next point in dispute relates to the apportionment of the
injury between the city and the factories that discharge their
waste directly into the river. How widely counsel of the respec-
tive parties differ will appear from the fact that the city con-
tends that the proofs show that forty-six per cent. or less of
the organic matter that enters the stream is attributable to the
sewers, and fifty-four per cent. to the other sources of pollution,
while counsel for the complainants contend that the sewage
nuisance is more than eighty-five per cent. of the whole.

The principal witness for the city on this branch of the case
is Mr. Whipple, a chemist and bacteriologist of learning and
experience. This gentleman and his partner, Mr. Hazen, an
engineer, were employed during the year 1906 to make a report
to Paterson touching the best method of sewage disposal. Their
employment was one of the results of the agitation of the ques-
tion of a trunk or intercepting sewer in the valley of the
Passaic. The report, with its appendices, contains an elaborate
discussion of the entire subject. The tables annexed to it were
made without any reference to this suit, and, consequently,
without being open to the imputation of partiality. It has been
agreed that they may be referred to. In preparing to give evi-
dence in this case Mr. Whipple was somewhat hampered by the
instructions received from counsel. His conclusions must there-
fore be received with caution, for his tables have been prepared
on somewhat erroneous assumptions. Acting on his instructions
he excluded from his estimate of pollution for which the city
is responsible all the street wash (11,000 pounds per diem),

whether it flowed through the sewers or whether it did not. He estimates that on an average there passes through the sewers daily, in solution or suspension, matter for which the city is responsible, to the amount of 49,200 pounds. And into the river or through the sewers, matters for which the city is not responsible, 44,240 pounds. In the latter figure he puts all the street waste (11,000 pounds). But, as I have already said, the city is responsible for so much of it as it diverts into its sewers. Unfortunately, Mr. Whipple was not instructed to apportion it. He concedes, I think, that much the greater part goes into the sewers. Assuming that three-quarters of it does, we must add three-quarters of 11,000 pounds to the matter chargeable to the city and deduct it from the amount not chargeable. This gives us chargeable, 57,450 pounds; not chargeable, 39,990 pounds.

These figures give us the total solids, that is, all the matters, organic and inorganic. But it is the organic matters with which we are here concerned, for they alone cause the injury. Hence it is that Mr. Whipple has given us another table of these matters.

Making the proper allowance for street wash, these are his figures for the organic matter alone: Organic matter chargeable to the city, 27,100 pounds; organic matter not chargeable, 21,080 pounds.

But I do not regard either of the above tables as being of as much importance to the present inquiry as the table showing the relative amounts of nitrogen which these organic matters contain. It is the nitrogenous products, animal and vegetable, that are chiefly responsible for the nuisance. This is Mr. Whipple's testimony:

"*Q*. Is the nitrogenous matter in the water offensive to the smell?

"*A*. It is more likely to undergo decomposition and cause offensive smells.

"*Q*. So that the greater the amount of nitrogenous matter that is put into the stream the more offensive it is likely to become to the smell?

"*A*. I think that is true.

"*Q*. There would be more nitrogen, I suppose, in animal decomposition than in vegetable?

"*A*. Yes, sir; generally speaking.

"*Q*. Considerably more?

"*A*. Yes; considerably more."

This evidence is rendered more emphatic by what he says of the silk gum. He found that it contained about seventeen per cent. of nitrogen, about the same, or possibly a little more, than fæcal matter contains. This, he says, is much the most offensive matter discharged from the factories.

This being so the following figures in Mr. Whipple's table are peculiarly significant.

Making the same correction as before in reference to the street waste, we have for the daily discharge: Nitrogen in sewers for which city is responsible, two thousand nine hundred and eighty pounds; nitrogen in factory and other waste for which city is not responsible, one thousand pounds.

There is another thing that comes in to effect the general result. The water flows about three miles after it leaves the factories, as does most of the sewage. Mr. Whipple admits that inasmuch as factory waste contains a larger proportion of mineral matter in suspension, more of it would be likely to settle before reaching the lake. And then we have the fact that while the factories empty their waste into the river, the Thirty-third street sewer and the Market street sewer, the largest of all, are pouring an increasing quantity of sewage directly into the lake.

Speaking of the factory waste and discussing the question how much of it must necessarily go into any intercepting sewer that might be built and how much of it might safely be allowed to flow into the river, Mr. Hazen, in the report to which I have adverted, used this language:

"Of the injurious and polluting substances by far the greatest quantity is carried by a comparatively small volume of concentrated liquor, not exceeding five or at most ten per cent. of the total volume of water used in the dye-houses."

He is here referring to the silk gum (of which Mr. Whipple estimates that five thousand one hundred pounds are discharged daily into the river) and to the escaping olive oil used in washing the silk. He proceeds:

"Certain further quantities of discharge contain some polluting materials, *but the great bulk of the discharge consists of wash water containing only mineral substances or organic substances in such small*

*quantities that they do not pollute the river."* * * * Taking into
account all the data collected, I estimate that the manufacturing wastes
of the city will add twenty-five per cent. to the volume of the sewage to be
treated, and that the material added is, on the whole, considerably more
difficult to treat than domestic sewage."

He adds, it is true, that these wastes will increase the difficulty
and expense of treating the sewage to the extent of *fifty* per
cent., but this consideration is foreign to our present inquiry.
The report, with its appendices, is admitted to be the joint pro-
duction of Messrs. Hazen and Whipple, and the passage I have
read is based on doubt on Mr. Whipple's accompanying appen-
dix (No. 1). If there is anything in Mr. Whipple's evidence
which shows present dissent from the conclusion reached by him
in this report (and taking his evidence as a whole, I do not
think there is), more weight may fairly be given to the latter
than to the former. The difference, if any, is to be ascribed
to the instructions of counsel.

There is one other remark called for by the evidence. The
term "pollution" is likely to mislead if its meaning be not
clearly defined. There is some confusion in the evidence on
this head: No water, except distilled water, is perfectly free
from foreign substances. A river contains in its natural state
both mineral and vegetable substances held in suspension and
solution. Mr. Hunziger's evidence gives a striking illustration
of this. He says that, by analysis, he found, in solution, in the
artesian well water used in the Weidman dyeing establishment
one thousand seven hundred and seventy pounds of solid (min-
eral) matter per million gallons, and in the pure river water
five hundred and eighty pounds. The solids held in suspension
or solution in the waste water discharged from his works (con-
sisting of both river and artesian water) amounted to twenty-
one thousand pounds in seven and a half million gallons;
but of this amount seven thousand nine hundred pounds were
contained in the water in its original state. He also testifies
that much of the solids so contributed were not detrimental,
and because of the chemical reactions that may take place be-
tween the alkaline and acid matters when they get together into
the stream some of them may conduce rather to its purity than

to its pollution. Mr. Whipple, in giving his evidence, does not always discriminate between such additions as are harmful and cause nuisance, and such as do not. Perhaps it is impossible to do so; but here, too, his instructions may have hampered him. It will not, however, do in an investigation of this sort to forget this important consideration. *Harmful* pollution is quite a different thing from pollution which consists merely in the presence, even in considerable quantities, of minerals held in suspension, or of minerals produced by chemical reactions whose specific gravity causes them to sink quickly to the bottom.

Taking all the evidence heretofore considered, I should be disposed to conclude that the amount of polluted matter, coming from the sewers, harmful to the properties involved in this suit and likely to create a nuisance to those properties, is, at present, from two-thirds to three-quarters of the whole.

Hitherto, no allusion has been made to one source of pollution which, in the evidence given on behalf of the city, has played a principal part. I cannot help thinking that more stress has been laid upon it than it merits. Many witnesses were called by defendant who testified that during the past twenty years or more the oily tar smell from the gas works was that which was chiefly noticeable. Mr. Hazen, in his report which was presented to the committee in July, 1906, makes this statement about it: "At the present time the gas works, perhaps, contribute more to the offensive condition of the river than any other *single* establishment." It will be perceived that he does not, by any means, assert that the gas works contribute more than all the other establishments combined. His statement in this form, is, no doubt, justified by the facts, certainly by the facts as they were up to the early part of 1906. He says that it is quite possible to render this waste inoffensive, and in an appendix to his report, Mr. Clark states how it may be done. Mr. Whittaker, the superintendent, was called as a witness for the complainant. He admits that the company has, in times past, allowed some of the tar oil to pass into the river; he admits, too, that he told Mr. Clark, whose report bears date February 15th, 1906, that forty thousand gallons of water were then being discharged into the stream and that this contained, at times, considerable tar

matter, but he says that since the introduction of improvements, made a year ago, none of that matter has been allowed to escape. There is no evidence to the contrary. The effluent waste water is discharged into the stream through a pipe, whose extremity is under the surface. It seems to me that if Mr. Whittaker's statement was incorrect, it could, by a series of observations, conducted near the mouth of the pipe, have easily been determined that the effluent still contained water permeated with this objectionable waste. A slight confirmation of Mr. Whittaker's statement is to be seen in one of the tables compiled by Mr. Whipple, and to be found on page 33 of the appendices to the Hazen report. On June 12th, an examination was made of the water at the Nineteenth street bridge, among other things, to determine its odor, and in none of the samples taken between six-twenty A. M. and eleven-thirty P. M. was any tarry odor reported, although in the samples taken in the preceding February, at the same place, while the odor appears to have been mostly that of sewage, it is reported as occasionally tarry. In September, 1906, on the other hand, Professor Cornwall was requested by the city to drive up and down the river, and he then recognized an odor which, at one point, he characterizes as an "indescribable inoffensive odor, rather heavily charged with organic matter, vegetable matter; little stagnant smell; just a little bit of odor that anybody who was not looking for it would not notice at all," and at another point, "as tar and ammonia odor, strongly perceptible, but not (to him) an offensive odor."

It appears that in October, 1893, there was an unprecedented freshet in the Passaic. It overflowed all the lower parts of Paterson covering its streets along the river bank with water many feet deep. Mr. Whittaker says that the river rose four feet above the relief holders, or .tank, which contained three or four hundred thousand gallons of tar; that a very large quantity was washed out and went down the stream; that some of it was deposited at the Dundee dam. He adds: "The presence of oil down there now does not mean that anything is going into the river from the gas works at the present time." If this oil adhered to the scum along the banks and at the bottom, its odor

would, no doubt, for a long time and particularly when the water was low, be readily perceptible. What would be true of the tar that escaped in the freshet would also be true of that which in former years was permitted, intermittently, to run out of the tanks. So many witnesses have testified to the presence of the smell that it would be impossible to ignore its existence during a considerable portion of the time covered by the evidence. At the same time, it is quite impossible to conclude that it consti-tuted the principal source of the nuisance. In the conflict that has been raging for the past twelve years between the property owners and Paterson, it would be strange, indeed, if Paterson, knowing all the time that the odor came principally from the gas works and that the property owners were on the wrong scent, had not taken measures to cause its abatement. No more intelligent and well-informed witness was sworn in the cause than Dr. Leal. He was health officer of the city in 1896, and he had made a spe-cial study of the problems growing. out of Paterson's sewage. In his report for that year he said:

"Repeated allusion has been made in these reports to the nuisance and menace to health caused by the condition of the Passaic river below the falls. Each year the amount of sewage poured into it has become more and more out of an allowable proportion to the amount of water in the river to receive it and properly diluted to take care of it, so that for some years past the river has been practically an open sewer."

I do not now refer to this passage as showing that the doctor then thought the river a menace to health; he has since modified his views in this regard, but as indicating how slightly he must have considered the effluent from the gas works as affecting the problem. Possibly the gas works were using naphtha at the time this report was made, a substance that has no tarry re-siduum, but if so, then the city's witnesses, in so far as they tes-tify to the presence of the tarry odor for several years prior to 1899, when Mr. Whittaker says they ceased to use the naphtha, were mistaken.

Looked at from the standpoint of the nuisance created, I doubt, very much, whether, except on rare occasions, the tar oil constituted an important factor. Even assuming its odor to have been at times more intense than the sewage odor, it would

not be necessarily regarded as the more objectionable. The faculty of association comes in strongly in these matters, and if a characteristic smell is always associated with a disgusting appearance its effect upon the individual is very different from that of a smell quite as strong unattended with such association.

I come now to another question. Mr. Whipple concludes by a method which seems to be founded very much on assumption and is, if I may presume to say so, somewhat fanciful, that for the "appearance" of the river (in which he includes discoloration and matter visibly held in suspension), Paterson is responsible to the extent of thirty-five per cent. and the direct river drains to the extent of sixty-five per cent. This ascertainment, even if entirely accurate, does not seem to be of much consequence. The coloring matters that escape from the dye works are not *per se* objectionable. They are the very colors that are most affected by the wearers of silks. They neither cause odor nor unpleasant associations. Of course, they may make decomposing and putrefying masses more conspicuous, but, in general, the purplish blue tinge which they are said to communicate to the stream hardly compares in point of repulsiveness to the masses of fæcal matter often seen floating on its surface.

The other witnesses who testify on this branch of the subject are Mr. Hering, Mr. Harrison, Mr. Fonda and Dr. Leal. Mr. Hering, the engineer employed by the Passaic Valley Sewerage Commission, says he would consider that the matter discharged from the sewers and the factories was about equal in point of offensiveness. He adds: "If my recollection is right, there was even considerably more fluid discharged from the manufacturing establishments than there was city sewage." It is not quite clear whether the witness includes street wash passing through the sewers in this estimate and whether he is giving conclusions based on examinations made by himself, or merely stating his recollection of the result of Mr. Whipple's investigations. He expressly says, however, that his conclusions were not based on analytical data. They were those that he formed with a view to giving evidence in a suit between Paterson and

the East Jersey Water Company. His evidence there related to the odor or pollution at the point of discharge and not specially to the odor in the lake. The question here presented, viz., the relative amounts of nitrogenous matters found in the sewage and in the factory waste, did not come within the scope of his investigation.

Mr. Harrison's testimony does not differ very much in character from Mr. Hering's. He says:

"I will stand to my opinion based upon all these facts, that the sewage of Paterson is not cut (?) up in quantity with the dark pollution of the mills, and at least fifty per cent. of the quantity of polluting matter going into the river comes from the mills, and in my opinion at least seventy-five per cent. of the nuisance to the eye and sense is from the mill refuse—from that refuse—and only twenty-five per cent. of underlying low down basis is from sewers. Of course, the pollution from the household sewage and fæcal matter is much worse than the pollution that comes from the mills—that is, for drinking, carrying germs."

This testimony is not founded on measurements of flow or on analysis. It is the opinion of an intelligent engineer, based on what he could observe as he walked or rode along the river banks, aided, no doubt, by reports read and information received from those who had more or less knowledge of the subject.

The last witness is Dr. Leal, a physician who has devoted a great deal of attention to sanitary science; who has an intimate knowledge of all that concerns the pollution of the river and whose opinion is entitled to much weight. He testifies that his estimate is that nineteen million gallons of refuse per diem come from the dye houses, "which form the vast bulk of the manufacturing wastes" and seventeen million gallons come from the sewers. Mr. Fonda's estimate is twenty-six million gallons going directly into the river and twenty millions from sewers. Neither of these gentlemen attempted to compute the relative amount of solids contained in the water thus discharged. Speaking of the manufacturing waste, Dr. Leal says:

"The chief constituents in which we are interested besides the dyestuffs, which give rise to the color, is the soap. They use vast quantities of soap, and that soap is sixty or sixty-five per cent. organic matter and it decomposes and causes * * * the scum."

He apparently attributes more importance to the soap than to the highly nitrogenous silk gum, five thousand one hundred pounds of which are, according to Mr. Whipple, every day emptied into the stream. As I understand it, the gum is discharged with the soapy liquor and he probably includes it in that designation.

There does not seen to be much contrariety of opinion between the five witnesses whose testimony I have been analyzing. None of them have actualy measured the flow from the sewers at their respective outlets. With the exception of Mr. Whipple and Mr. Fonda, none of them have attempted to compute it. It would have taken so much time to have measured it accurately that the money and labor expended would have been, probably, out of all proportion to the benefit. I have no doubt that Mr. Whipple's estimates are approximately correct. In the case of the sewers, the problem would have been complicated with an estimate of the rainfall and the ground flow. For the practical purpose of solving the problems involved in this case the data are sufficient. The complainants have not attempted to produce witnesses to controvert the conclusions reached by Mr. Whipple.

To sum up, the witnesses all think that the mere volume of polluted water discharged from the factories is slightly in excess of, or at least equal to, the volume of sewage discharged from the sewers. They all think that the number of pounds of total solids in the household sewage proceedings from the sewers does not exceed that discharged from the factories. In point of offensiveness, standing at the outlets of the pipes, Mr. Hering and Mr. Harrison think that the smell of the factory waste is more objectionable than the smell of the sewage.

None of the witnesses, except Mr. Whipple, have attempted to compute the relative amount of organic matters in the sewage and in the factory waste or to analyze the discharge. Of course, when these matters commingle in the river and reach the lake, no witness, scientific or unscientific, could hazard even a guess as to how much of the nitrogenous substances could be attributed by the sense of smell to the factory waste, and how much to the sewage. I do not find in the evidence any dissent from the view that the amount of smell attributable to factory waste and

that attributable to sewage would, excluding the tar smell, be proportionate to the amount of the nitrogenous substances they contain.  Mr. Whipple has, as I have already stated, found these relative amounts to be, per diem, two thousand nine hundred and eighty pounds for the sewers (including three-quarters of street wash) and one thousand pounds for the factories.

I have thus far principally considered the case from the standpoint of causes.  I now come to effects.

There can be no doubt that the effects arising from the causes indicated, have produced an actionable injury at the lake.  No one disputes that the water is full of foul matters which have rendered it unfit for fishing, for cutting ice, for boating and for drinking, but anyone reading the evidence in a cursory way would think that on the subject of odor it was highly conflicting.  Very slight consideration is sufficient to account for much of the apparent conflict.  In the first place, people are differently affected by smells.  To one, one kind of smell is objectionable; to another, another.  In the second place, the river itself is never the same on two successive days.  The Cook tables show, as I have said, that the flow of the stream below Paterson varies from nine thousand cubic feet, *i. e.,* over fifty-six thousand gallons per second, to no flow at all.  Between these extremes the differences of amount are almost infinite.  A striking illustration of how much volume of water has to do with pollution or non-pollution is to be found in the waters of New York bay, which receives thirty times the sewage of Paterson and which are yet free from odor.  This is because the river water and the water brought in from the ocean by the tides is much more than sufficient to take care of it.

When, therefore, roughly speaking, one thousand cubic feet are flowing in the Passaic there will be, theoretically, no nuisance.  And this accords with the fact.  The river is not objectionable in cold weather.  The nuisance is felt only when the water is low and that is nearly always in the summer or early fall.  Then, not only does the odor proceed from the water itself, but from the exposed river banks.  It varies with the wind and the conditions of the atmosphere.  Mr. Nash, who bought his property in 1887, says, that at that time the water was pure and

that his family bathed and boated in it; that the bottom of the lake in front of his house was clear, but it is now covered with a deposit. He says that he perceives the smell in his house practically all the time; that it is worse at nights, and that in the summer he has to keep his windows closed. He says that when the filthy deposit left on the shore dries, it blows away and that the smell is "fearful." Mr. Phillips, whose wife's property is on the shore opposite, says that there are two smells perceptible; one the water-closet smell that at times almost suffocates, and the other the coal tar smell, which is a sort of antidote; that the odor is, at times, intolerable; that his wife and children have been made sick by it and that it has caused vomiting. Mr. Mercelis testifies that

"many a night I had to shut my windows and I have done it in the day, if the wind was coming from the east, and many a night, even in the hottest weather, I would have to close up our windows, couldn't endure the stench."

It is unnecessary to go through the testimony of all the complainants. There may be some exaggerations in it, but it is much the same. Some of the witnesses characterize the conditions in stronger terms than others, but they all assert that it has been the sewage smell and not the tar smell that has chiefly affected them. On the other hand, the witnesses for the city emphasize the tar smell, and say that the sewer smell is neither so strong nor so offensive. When, however, Dr. Leal, as far back as 1897, characterized the river as even then "practically an open sewer," and when Mr. Hering states that under the direction of the state sewerage commission he made an examination of it in 1896, and found it highly polluted and very offensive in summer, and that in 1906 he found the odor very much greater, it is plain that the property owners along its banks are suffering from a very real and not a fancied injury. Two questions remain to be considered—*first,* the time for which compensation or damages shall be given, and *second,* the amount.

At first blush, it would seem that as compensation was to take the place of an injunction and an injunction could issue only on filing the bill, the compensation should be computed from

that time. An examination of the cases, however, does not bear out this view. The precedents, I think, indicate with clearness that the compensation is to be awarded from the time of the taking, and this taking dates, as I have said, from the summer of 1892.

In the first place, it is clear that the case must be regarded as one of appropriation by the city, for public use, of property rights attached to land. This was the view of the court of errors in the Simmons appeal, for Justice Van Syckel expressly says that the complainants are entitled to an injunction "unless the city will consent to make compensation for the diminution in the value of their lands as shall be ascertained to be just."

This, too, was the issue finally made by the pleadings, as will be seen by reference to page 78 of the printed case:

"This defendant elects rather than submit to an injunction, pursuant to the prayer of complainants' said bill of complaint, to make such compensation to the complainants, respectively, for the alleged diminution in value of their said lands and property rights as shall be ascertained by this court to be just, so far as this defendant shall be held liable to make compensation for such diminution in value."

It appears from the decision that there is one rule of compensation in equity and another at law. Both of these rules have been approved by the court of errors; the equitable rule in *North Hudson Co.* v. *Booraem, 28 N. J. Eq. (1 Stew.) 450,* and the legal rule in *Leeds* v. *Camden and Atlantic Railroad Co., 53 N. J. Law (24 Vr.) 229.* Mr. Justice Reed, in *Trimmer* v. *Railroad Co., 55 N. J. Law (26 Vr.) 46,* thus sums up the difference: "The result of these conflicting rules seems to be that if a corporation, under the conditions mentioned, takes proceedings to condemn lands the legal rule applies, but if the question of the value of the land becomes involved in a suit in equity, the equitable rule applies." The legal rule which is of purely statutory origin, gives compensation for the value of the land at the time of the award of the commissioners, the equitable rule, at the time of the entry.

In *Trenton Water Power Co.* v. *Chambers, 9 N. J. Eq. (1 Stock.) 471,* it appeared that the Trenton Delaware Falls Com-

pany was chartered in 1831; that it applied to one Chambers for permission to occupy his land, deferring compensation to a future day and that he consented. In 1840 the company was decreed to be insolvent and its property and franchises were sold. The purchasers were, by subsequent act of the legislature, incorporated under the name of the Trenton Water Power Company in 1853. Chambers sued at law to recover damages for the construction of the raceway by the original company over his lands and for continuing and maintaining the same. The Water Power Company instituted proceedings to enjoin, and this court gave compensation for the value of the land taken at the time of the entry, nearly twenty years previously, with interest. In *Paterson, Newark and New York Railroad Co.* v. *Kamlah, 47 N. J. Eq.* (*2 Dick.*) *331*, ejectment was brought by Kamlah to recover possession of land on which the predecessor of the complainant had entered about twenty years before. The company applied to this court to stay proceedings. The company was decreed to give compensation for the value of the land at the time of the original entry with interest, and the decree was affirmed on appeal. *New York and Greenwood Lake Railway Co.* v. *Stanley's Heirs, 35 N. J. Eq.* (*8 Stew.*) *288*, was also a suit brought to stay an ejectment. The entry had been made by the predecessor of the complainant almost ten years before. Mr. Justice Depue, speaking for the court of appeals, said: "The rule adopted in *Chambers v. Trenton Water Power Co.*, with respect to the time as of which the value of the land is to be determined and from which the interest is to be calculated was adopted *as the general rule by this court* in *North Hudson County Railroad Co.* v. *Booraem*, and is in conformity with the decisions of other courts in cases where the original company's property and franchises had been transferred by a judicial sale to purchasers who, by the legislative act, became a new corporation. Succeeding to an equity of the Montclair Railway Co., arising out of its entry on the premises, the appellants take the rights of their predecessors, *cum onere*, subject to the obligation to render to the respondents the same equity which the Montclair Railway Co. would have been required to render, if that company were

making an effort to retain possession. Paying interest on the value of land and damages from the date of the original entry is not paying the debt of the defunct corporation. *It is making the recompense which the respondents are equitably entitled to on the enforcement of an equity against them."*

On the Simmons' appeal in this very case Mr. Justice Van Syckel referred to *Paterson and Newark Railroad Co.* v. *Kamlah, supra,* as affording a precedent for the award and ascertainment of damages. It will be observed that in the cases cited compensation not only antedated the filing of the bill, but it antedated the use and enjoyment of the property by the corporation then in possession.

Now the only difference that can be suggested between the cases referred to and the present is this: that in those cases the companies had the right to condemn and that they entered by consent, while here the city may not have the right to condemn and it entered (so to speak) without consent. But this rather strengthens the position of complainants. A court of equity certainly will not accord a stronger position to a mere wrong-doer than it will to one who enters by permission. It will not declare that he who has no right to take the property of another, even on the terms of making compensation, may demand and receive more liberal terms than he who has such right. That the city stands in the attitude of one asking a favor appears from the opinion in the *Simmons Case.* The complainants' strict right is an injunction, and such a right has been accorded in circumstances resembling the present, even against a city more populous than Paterson. *Attorney-General* v. *Leeds Corp., L. R. 5 Ch. App. 583.* But the court, contrasting the magnitude of the injury on the one side with the slightness of the benefit on the other, thought that compensation, if the city were willing to make it, would be more equitable than an injunction. It cannot be doubted that it was intended that this compensation should be made according to the ordinary principle of equity. As the taking was to be regarded as an entirety, so was the compensation to be. Equity does not do justice by halves. In the case in hand there is, moreover, a peculiar propriety in adhering to the equitable rule. The act of the city in building its sewers

was expressly authorized by statute. The riparian owners could not complain of that. By fair implication, derived from the language of the act, the city had the right to discharge its sewage into the river. *Simmons* v. *Paterson, 60 N. J. Eq. (15 Dick.) 391.* This act, too, was, of itself, no invasion of the rights of the property owners. It was not until Paterson commenced to pour into the stream more than the stream could take care of that the complainants could be said to have been injured. As soon as it became evident that they had a reasonable ground of complaint the property owners made application to the board of health of Paterson to abate the nuisance. Failing there they applied to the state board of health, and that body being unable to help them, to the legislature. Not until they had exhausted every other means of redress did they file the bill. The case in hand bears some resemblance to those in which the entry has lawfully preceded the making of compensation. *Kough* v. *Darcy, 11 N. J. Law (6 Halst.) 237; Den* v. *Morris Canal, 24 N. J. Law (4 Zab.) 587; Lehigh Valley Railroad Co.* v. *McFarlan, 31 N. J. Eq. (4 Stew.) 706; S. C., 43 N. J. Law (14 Vr.) 608.* In that line of cases the rule of damages is held to be the same as that sanctioned by the *Booraem Case.*

Neither on principle nor on precedent do I find any warrant for the idea that the injury may not and ought not to be regarded by equity as an entirety, to be compensated for as such.

This brings me to the question of the amount of compensation. The defendant, by its amended answer (at *p. 79*), avers that its taking "is to be temporary, and is to continue no longer than five years from the date of the filing hereof (March 26th, 1906)." This temporary taking is permissible. *Hepburn* v. *Jersey City, 67 N. J. Law (38 Vr.) 114.* The problem then is to ascertain the damages from June 1st, 1892, to March 26th, 1911.

On the question of the measure of damages the only case found in our own reports is *Hatfield* v. *Central Railroad Co., 33 N. J. Law (4 Vr.) 252.* In that case the plaintiff was the owner of a tract of land fronting on a street, to the centre of which he had title. Defendant laid a track in the street and main-

tained it there for fourteen years. The plaintiff carried on a lumber business on the land in question. It did not appear that he had desired to appropriate it to other purposes or had offered it for sale. Chief-Justice Beasley said: "It seems to me to be perfectly indisputable that the only damages which the plaintiff can claim of these defendants, in consequence of the railroad track being illegally laid along this land, is for the loss and inconvenience which he has sustained in the prosecution of his lumber business." In an action for negligently obstructing a drain which caused water and filth to flow back into plaintiff's cellar, it was said by the supreme court of Massachusetts (*Emery v. Lowell, 109 Mass. 197*) that plaintiff could recover for any injury which diminished the value of his use and occupation of the house. Where the property is rented, the proper measure of damages was said, in *Jutte v. Hughes, 67 N. Y. 271,* to be the difference between the rental value free from the effects of the nuisance for which damages were claimed and subject to it. These citations sufficiently declare the rule to be applied to the case in hand, which concerns both properties rented and properties occupied by their owners. I think it is quite clear, under the decisions, that no allowance can be made for alleged depreciation in the value of the lands themselves. The injury must, under the pleadings, be treated as temporary, and not as permanent. *Brewster v. Sussex Railroad, 40 N. J. Law (11 Vr.) 57.*

I do not apprehend that, under the facts of this case, it would be either just or proper to so apply the above rules as to give to the owner of property personally occupied larger damages than to the owner of property rented. Compensation is not awarded for personal discomfort. If evidence of discomfort be received it is only relevant in so far as it bears upon the question of annual values. The situation of all the properties, in respect of the injury, is so similar that the amount must be determined in some uniform way.

As a convenient means of reaching a definite result I have estimated the annual value of such parts of the various properties as are, or may be, affected by the condition of the river, as follows:

| | |
|---|---|
| Peter Van Bussum | $350 |
| Edo V. & C. D. Cadmus | 450 |
| Martha Phillips | 350 |
| Richard Van Riper | 350 |
| Henry W. Doremus | 375 |
| Peter Alea | 400 |
| Geo. G. Van Riper (ice houses, $500; other property, $500) | 1,000 |
| Edo Van Riper (ice house, $125, from Oct. 12th, 1899; other property, $475) | 600 |
| Richard H. Hoitsman | 300 |
| Mary A. Van Saun | 350 |
| Peter H. Doremus (2 houses) | 500 |
| Paulina Wehnert | 300 (?) |
| Frederick H. Gelderman | 300 |
| Margaret Kipp | 18 |
| Richard Outwater | 50 |
| Albert A. Outwater | 450 |
| Garret Terhune (to 1902) | 350 |
| "         "      (since 1902) | 720 |
| John H. Mercelis | 350 |
| Scotto Nash | 850 |

The above estimates do not represent the total rental values of the various properties. The farms may be described as narrow ribbons of land, being, with two or three exceptions, from one hundred and fifty to five or six hundred feet in width, and running back from the river, in some cases, over a mile. As originally laid out, the plan was, doubtless, to give to every farmer a frontage on the stream and some wood and meadow land in the rear. Counsel for the city expended considerable effort in showing that these lands are intersected by two railroads, and that the parts in the rear are so severed as not to be entitled to the designation "riparian." The Susquehanna railroad, where it most nearly approaches the river in crossing these farms, is thirty-six hundred feet therefrom. At that distant, the odor, if it can be perceived at all, is so slight that it has no effect upon land values. In the above estimates I have made a deduction on this account. The question of legal severance is therefore unimportant. The complainants gave no specific evidence of rental or annual values. I have, therefore, been obliged to take, as my guide, the evidence of defendant's expert witnesses on this head, making such variations therefrom

as the situation of the land in reference to the stream, the acreage, the character of the buildings and their nearness to the river and to trolleys and stations, their condition of repair, &c., seemed to require.

In the case of some of these property owners, the contention of the city was that they were non-riparian because former owners had given to the Dundee Company rights of flowage. This did not divest the grantors of their ownership of the fee. Subject only to the servitude of flowage, they possessed every right *ad medium filum aquæ*, which such ownership carries with it. It seems to me very plain, indeed, that they or their grantees must still be regarded as riparian owners for all the purposes of this controversy.

Taking the above table as my basis, I have estimated the diminution in rental or annual value caused by the pollution of the river and attributable to Paterson alone, as follows: For the year 1892, five per cent. of the sums above named, and for each succeeding year, one per cent. in addition. This, of course, is an arbitrary ascertainment. It does not regard the differences in temperature and rainfall that have existed in the hot and dry seasons of the successive years, and consequently the differences in the amount of odor and deleterious pollution. But an accurate ascertainment and adjustment of these difference is impossible. Even precisely the same number of inches of rainfall in two successive summers does not mean the same flow in the river. A rainfall evenly distributed and moderate in amount is largely absorbed by the soil or evaporated. In this latitude it is estimated that nearly one-half of the rain that falls in the course of a year is evaporated. The same amount of rainfall coming in heavy storms or violent showers would quickly flow off the surface and be carried away in freshets. The amount of compensation for the taking for the twenty years is a single sum, and if ascertained in the manner indicated will, I think, on the whole, represent the aggregate compensation, as nearly as it can be ascertained, and more exactly than it could be in any other way that suggests itself to me. I have increased the compensation, year by year, for the reason that

the population of Paterson has increased and is likely to increase year by year. The rate of increase is about three per cent. per annum, but this does not imply a diminution of annual value to the same extent. The amount awarded may seem small. It is, however, more than double the amount named by the city's experts, who, for the entire injury, as well that attributable to the factory and gas wastes as that attributable to the sewers only allow for the year 1906 from eight and one-half to ten per cent. of the total annual rent, whereas I allow for that year about twenty per cent. for so much of the nuisance as is attributable to Paterson alone. The reasons for this very moderate allowance are the following: The land is, nearly all of it, used for farming or truck gardening. It is not pretended that the odor injuriously affects the land. The houses are old-fashioned, and most of them without modern improvements. The means of access are not such as to attract the ordinary commuter. Churches and schools and places of amusement are distant, and to the north and south along the river are an increasing number of factories, and such a population and such dwellings as factories bring with them. The growth of these factories toward the land in question would seem to be inevitable. There is no evidence that the very rapid growth of that has taken place in Passaic up the river and headrace has been arrested in any degree by the pollution. Besides, I do not find that sickness and disease have attended the fouling of the river to any such extent as one would naturally suppose. The weight is that malaria has considerably decreased; the reason being that the œnopheles mosquito, which, according to the present medical belief, is the sole cause of malaria, cannot breed in a stream whose surface is covered with a thin film of oil. Some of the complainants say they have suffered from this malady, but there is no reason to suppose that they would not have suffered as much, if not more, if former conditions had prevailed. Undoubtedly nausea has been produced in some instances, and the discomfort on hot nights, with a breeze blowing off the water, has been very great. The river is no longer a place to boat or fish in, or to cut ice from, or water cattle in. But, on

the other hand, there is no evidence of depopulation along the river banks, or of inability to rent to farmers or truck gardeners. No doubt the number of persons who might wish to live in that locality has been diminished. In determining upon the above sum, I have endeavored to take all these circumstances into account.

The problems involved have been difficult of satisfactory solution, but, sitting in place of a jury, I have made the best approximate ascertainment of the damages that I could. In making it, I have not taken into account alleged depreciation in the market value of the land. There is no specific evidence of loss of sales and the rule seems well settled that where the injury is only temporary and removable, such depreciation cannot be considered. The evidence in reference to the exchange of properties by Mr. Gelderman is too uncertain to be regarded as an exception.

I ought to add that the amount awarded may not be compensation for the entire injury, where the owners themselves occupy the lands, for the nuisance has not only diminished annual values, but it has also caused personal discomfort, and, if I am to believe the witnesses, in some cases, sickness. Either injury is, ordinarily, ground for an injunction. Under the issue framed in accordance with the opinion in the *Simmon Case* the money equivalent for an injunction is to be compensation for "the diminution in value of complainants' lands and property rights," alone.