## SALT LAKE CITY v. YOUNG.

No. 2532.   Decided January 11, 1915 (145 Pac. 1047).

1. WATERS AND WATER COURSES—PUBLIC WATER SUPPLY—PROTEC-
   TION FROM POLLUTION—POWER OF MUNICIPALITY. The Legisla-
   ture had power to enact Comp. Laws 1907, section 206, subd.
   15, which gives to a city, to protect from pollution the streams
   from which its public water supply is taken, jurisdiction over
   the stream for ten miles above the point from which the water
   is taken[1].   (Page 353.)

2. NUISANCE — PUBLIC WATER SUPPLY — POLLUTION — COMPLAINT.
   A complaint by Salt Lake City, which charged that defendant
   unlawfully and willfully and continuously for ten days and
   more permitted twenty-seven head of horses to be at all times
   accessible to the stream from which the city secured its water
   supply, to pasture along its banks, to wade in the stream, and
   to run at large upon defendant's tract of land comprising about
   fifteen acres along the stream, contrary to a city ordinance,
   charged defendant with acts which the city could by its
   ordinance prohibit and was not demurrable. (Page 367.)

Appeal from District Court, Third District; *Hon. F. C. Loofbourow,* Judge.

Complaint by Salt Lake City against Seymour B. Young, Jr., for the violation of a city ordinance prohibiting the pollution of a stream.

Complaint dismissed on defendant's demurrer.   Plaintiff appeals.

REVERSED.

*H. J. Dininny, Aaron Meyers, W. H. Folland* and *W. W. Little* for appellant.

*Thurman, Wedgwood & Irvine* and *Young & Moyle* for respondent.

APPELLANT'S POINTS.

The Supreme Court of Utah has held that a right to pollute a stream cannot be acquired by prescription. (*Joint*

---

[1]*People* v. *Burtleson,* 14 Utah 258; 47 Pac. 87.

*Con. Irr. Co.* v. *Utah & S. L. Canal,* 16 Ut. 246.) No right to
befoul a stream supplying water to the city can be acquired
by prescription, after it begins to be devoted to such public
use. (*Sprague* v. *Dorr,* 185 Mass. 10; *Inhabitants of Brook-
line* v. *Mackintosh,* 133 Mass. 215; *Kelly* v. *N. Y.,* 27 N. Y.
Sup. 164 [affirmed in 89 Hun. 246; 35 N. Y. Supp. 1109].)
The doctrine of "reasonable use" is a part of the common law
of riparian rights, and does not apply in this case because
the law of riparian rights has been abrogated in Utah both
by statute and by judicial decision. (4 Kinney, p. 3618, 2nd
Ed; section 1288x5, Compiled Laws, 1907; section 1288x20,
Compiled Laws, 1907; *Stowell* v. *Johnson,* 7 Utah 215; *Nash*
v. *Clark,* 27 Utah 215; Wiel, Water Rights in the Western
States, section 23.) It is often the effect of the exercise of
the police power that it practically destroys the value of
property by restricting its use. (*Mugler* v. *Kansas,* 123 U.
S. 623.) The mere fact that one effect of such regulation
will be to exclude some individuals from certain occupations
or to prevent them from using their property in some advan-
tageous manner which otherwise would not be unlawful, will
not make the regulations invalid. (*Com.* v. *Maletsky,* 202
Mass. 241; *Com.* v. *Sisson,* 189 Mass. 247; *Slaughter House
Cases,* 16 Wall 36; *Powell* v. *Pa.,* 128 U. S. 678.)

FRICK, J.

Salt Lake City, a municipal corporation, the appellant
here, filed a complaint against the defendant, respondent
here, charging him with having violated the provisions of
the following municipal ordinance, to-wit:

"Sec. 821. It shall be unlawful for any person to con-
struct or maintain any corral, sheep pen, pig pen, chicken
coop, stable or other offensive yard or outhouse along any
stream of water used by the inhabitants of Salt Lake City,
anywhere within ten miles above the point where said stream
is taken by said city, where the waste or drainage therefrom
will naturally find its way into said stream of water; or to
deposit, pile, unload·or leave any manure, or other offensive
rubbish, or the carcass of any dead animal along any stream
of water used by the inhabitants of Salt Lake City, any-

where within ten miles above the point where said stream is taken, where the waste or drainage therefrom will naturally find its way into said stream of water; or to drive, or to permit, or cause any other person to drive any loose cattle, horses, sheep or hogs through any canyon from the stream of which water is or shall be taken for the use of the inhabitants of said city, or to permit any cattle, horses, sheep or hogs to remain in or near, or to pollute any stream of water used by the inhabitants of said city anywhere within ten miles above a point where said water is first taken by said city."

Said ordinance was passed pursuant to Comp. Laws 1907, subd. 15, section 206, which confers certain powers upon the city, and which, so far as material here, is as follows:

"To construct or authorize the construction of waterworks, without their limits; and for the purpose of maintaining and protecting the same from injury and the water from pollution, their jurisdiction shall extend over the territory occupied by such works; and over all reservoirs, streams, canals, ditches, pipes, and drains used in and necessary for the construction, maintenance, and operation of the same, and over the stream or source from which the water is taken, for ten miles above the point from which it is taken; and to enact all ordinances and regulations necessary to carry the power herein conferred into effect."

There is a proviso to this statute requiring the city to provide a "highway" extending through the limits of its jurisdiction, as stated in the statute, on which cattle, horses, sheep, and hogs may be driven.

The complaint, omitting the formal parts, charges the offense in the following terms, to-wit:

"That the said defendant, Seymour B. Young, Jr., being then and there the owner and in possession of that certain tract of land of approximately fifteen acres through which runs that certain stream of water in Parley's canyon known as Parley's creek, at a point within 10 miles above the point where said stream of water is taken by the City of Salt Lake for the use of the inhabitants of said city, to-wit, 6 miles above said intake of said city, unlawfully and willfully did then and there and continuously for 10 days and more prior ·

thereto, permit 27 horses to pollute said stream of water by permitting said horses to be at all times accessible to said stream and to pasture upon and along the banks of the same, and to wade in and to drink from the same, and to drop their dung into said creek, and to run at large upon said tract of land where the waste and drainage therefrom naturally finds a way into said stream, contrary to the provisions of section 821 of chapter 29 of the Revised Ordinances of said Salt Lake City, in such cases made and provided.''

The respondent demurred to the complaint, setting forth seven distinct grounds why the complaint should be held insufficient. About all of the grounds may, however, be considered under the head that the complaint is defective in substance in that the facts therein alleged do not ''constitute a public offense.'' The district court sustained the demurrer and entered judgment dismissing the complaint and discharged the respondent. The city appeals and seeks a reversal of the judgment on the ground that the court erred in sustaining the demurrer and in entering judgment dismissing the complaint.

The questions presented for decision may be more easily understood by giving respondent's reasons why the demurrer was properly sustained, and hence I shall follow that course. Those reasons, as I understand respondent's counsel, in substance are: (1) That the ordinance in question is ''not authorized by any law or statute of the State of Utah''; (2) that said ordinance violates article 1, section 7, of the Constitution of this state, which provides, ''No person shall be deprived of life, liberty, or property without due process of law''; (3) that it also violates section 22 of article 1 aforesaid, which provides, ''Private property shall not be taken or damaged for public use without just compensation''; (4) that said ordinance also violates section 1 of the fourteenth amendment to the Federal Constitution; and (5) that subdivision 15 of section 206 (which I have set forth above) is void because it is in conflict with the several constitutional provisions referred to above. It is only fair to state that counsel concede that both the ordinance and statute admit of a construction

which, if adopted, might not invade the constitutional provisions referred to.

It has heretofore been determined by the Supreme Court of Utah that whenever the pollution of a stream by any person amounts to a public nuisance under Comp. Laws 1907, section 3506, the offender may be criminally prosecuted. *People* v. *Burtleson,* 14 Utah 258; 47 Pac. 87. Under that section any person who is injuriously affected by the nuisance may sustain an action to enjoin or to abate the nuisance. Since *People* v. *Burtleson* was decided, the Legislature passed a further act (Comp. Laws 1907, section 1113x), in which a "nuisance" is defined as follows:

"Whatever is dangerous to human life or health, and whatever renders soil, air, water, or food impure or unwholesome, are declared to be nuisances and to be illegal, and every person, either owner, agent, or occupant, having aided in creating or contributing to the same, or who may support, continue, or retain any of them, shall be deemed guilty of a misdemeanor."

See Laws Utah 1899, p. 66.

The violation of the foregoing section constitutes a misdemeanor, and, in addition to the right of an action by an individual, the board of health is also authorized to abate such a nuisance. Again, by Comp. Laws 1907, section 4274, the befouling of the "waters of any stream, well, or spring of water used for domestic purposes," in the manner in that section defined, is declared a nuisance. It is apparent therefore that the Legislature of this state has exerted the police power of the state in different ways for the purpose of protecting and maintaining the natural purity and wholesomeness of the waters flowing in the streams of this state. The reason why such great care is manifested by the Legislature to maintain the purity of our streams may perhaps be attributed to the fact that this state lies wholly within the arid belt, and for that reason the common law may have been deemed insufficient to afford adequate protection. Moreover, the common-law rule that waters may not be appropriated and diverted from a stream has been entirely abrogated in this

state, and every person may appropriate and divert any
quantity or all of the waters flowing in any stream, provided
he uses such water for a beneficial purpose. I advert to these
matters primarily for the purpose merely of directing atten-
tion to the ever present fact that riparian rights in the streams
of this state, if not entirely abrogated, have nevertheless been
modified to a large extent. But, in addition to the several
state regulations to which reference has been made, the Legis-
lature has also conferred certain powers and imposed certain
duties upon the municipal corporations of this state for the
purpose of protecting and maintaining the wholesomeness and
potability of the water used by the inhabitants of such munic-
ipalities. The statute conferring such powers and the ordi-
nance by which it is sought to be exerted in this case I have
hereinbefore set forth at large. In view that the statute ex-
pressly confers the power, respondent's contention that the
ordinance in question is not authorized by any statute or law
of this state is therefore clearly untenable.

Nor do I think that the contention can be sustained that the
statute and ordinance both are, or that either of them is,
void because they or either is violative of the constitutional
provisions upon which counsel rely and to which reference
has been made. It is universally conceded by both courts and
text-writers, that, in enacting statutes and ordinances such as
those in question here, the legislative bodies, whether state or
local, are exerting the police power which inheres in every
sovereign state. In exerting the police power to protect the
general health or welfare of the inhabitants, or in directing its
exercise by the municipality for such purpose, the state is
exerting one of the greatest prerogatives of sovereignty. In-
deed, this power is considered of such vast importance that the
sovereign is not permitted to surrender it or to be estopped
from exerting it at any and all times when the public inter-
ests require its enforcement. And this is so although its exer-
cise may interfere with property or property rights, or, under
certain circumstances, may even cause the destruction of the
same. The attempt to define this power has so often been
made by the most able jurists that it would smack of pedantry
for me to attempt it here. Perhaps as good and as compre-

hensive a definition as can be given is the one by Mr. Chief Justice Shaw in *Commonwealth* v. *Alger*, 7 Cush. (Mass.) 53. See, also, Cooley's Constitutional Limitations (7th Ed.) pp. 830, 831, for reliable definitions. It has likewise become well settled that the discretion with respect to when and how this power shall be exercised is primarily vested in the legislative, and not in the judicial, branch of constitutional government; and in case of its exercise that the courts will not interfere unless a statute, when properly passed, is palpably in contravention of some constitutional provision. *Mugler* v. *Kansas*, 123 U. S. 623; 8 Sup. Ct. 273; 31 L. Ed. 295; *People* v. *Hupp*, 53 Colo. 80; 123 Pac. 651; 41 L. R. A. (N. S.) 792; Ann. Cas. 1914A, 1177; *Durango* v. *Chapman*, 27 Colo. 169; 60 Pac. 635; *State* v. *Griffin*, 69 N. H. 1; 39 Atl. 260; 41 L. R. A. 177; 76 Am. St. Rep. 139; *State* v. *Wheeler*, 44 N. J. Law, 88; *State Board, etc.,* v. *Diamond Mills P. Co.*, 63 N. J. Eq. 111; 51 Atl. 1019; *Durham* v. *Cotton Mills*, 141 N. C. 627; 54 S. E. 453; 7 L. R. A. (N. S.) 321. The prevailing doctrine is stated in *Mugler* v. *Kansas*, *supra*, by Justice Harlan in his usual terse style thus:

"It belongs to the legislative department to exert the police power of a state, and to determine primarily what measures are appropriate and needful for the protection of the public morals, the public health, or the public safety."

Again, in *Bland* v. *People*, 32 Colo. 319; 76 Pac. 359; 65 L. R. A. 424; 105 Am. St. Rep. 80, in referring to this subject, the court says:

"It is said that the police power of the state is founded largely upon the maxim: 'Use your property in such manner as not to injure that of another.'"

It is further said:

"'The welfare of the people is the supreme law,' is a maxim of the law; and it is upon these two maxims that the police power of the state is largely based. In the exercise of the police power, the Legislature has a large discretion, and it is our duty to sustain such legislation unless it is clearly and palpably and beyond all question in violation of the Constitution."

The foregoing cases, without exception, are thoroughly considered, well reasoned, and all except the first one are based on some statute or ordinance prohibiting the befouling of water, and in a number of them the statutes or ordinances were assailed upon the same constitutional grounds on which the statute and ordinance in question are assailed. In those cases it is directly held that, although in enforcing the police power the use of property may be interfered with to the extent that the owner thereof may have to modify or change the manner of its use from one which is more to one which is less convenient to him, yet, if such interference is merely incidental to a proper enforcement of the power and does not deprive the owner of the reasonable use of his property, he cannot successfully maintain that his property is being taken or damaged for public use. While respondent's counsel do not seriously question the soundness of the principle laid down in the foregoing cases, yet they somewhat strenuously insist that the provisions of the ordinance in question transcend the rule just stated. In this connection they contend that the ordinance, in prohibiting every person from permitting "any cattle, horses, sheep or hogs to remain in or near, or to pollute any stream of water used by the inhabitants of said city anywhere within ten miles above a point where said water is first taken by said city," practically amounts to the confiscation of property when used for the purposes for which respondent uses his property as such use is made to appear from the complaint in question. This contention is not based so much upon the acts with which respondent is charged in the complaint, as it is upon that portion of the ordinance which prohibits any cattle, etc., to "remain in or near" any stream from which the water is used as stated in the ordinance. The rule is invoked that the validity of a law or ordinance must be tested by what may be, and not by what in a particular case is sought to be, done under it. The rule, that in case two constructions of a statute or ordinance are possible one of which, if adopted, will defeat the law, while the other will uphold it, it is our duty to adopt that construction which will uphold the law, is too well settled to require argument at this time. Moreover, the rule that, for the purpose of ascertain-

ing the intention of a statute or ordinance, it is not only our duty to consider it as a whole, but we must also keep in mind the object or purpose of the enactment and the evil consequences the lawmaker intended to guard against by its adoption, is elementary.

By applying these rules of construction to the ordinance in question, I think the objections that are inveighed against it by respondent's counsel largely disappear. For instance, it is contended that to prohibit cattle to be near a stream is too vague and uncertain to admit of reasonable enforcement. It is true that by segregating the phrase referred to from all other matter contained in the ordinance it appears to be somewhat obscure. But the manifest purpose of the whole ordinance is to prevent the pollution of water which is used for domestic purposes. With that thought in view, therefore, all acts which directly tend to affect or destroy the potability of the water flowing in our streams are prohibited. A careful reading of the ordinance makes clear that it was not intended to prohibit the mere casual straying of one or a few head of cattle, horses, sheep, or hogs along or near a stream. What the ordinance prohibits is "to permit any cattle," etc., "to remain in or near" the stream. It requires no argument to show that the prohibition is not against one, but it is against a number of cattle, and it is not directed against a mere incidental or casual straying into or near the stream, but what is prohibited is to permit a number of cattle, etc., to remain in or near the stream. To permit a number of cattle to remain in a stream must necessarily result in polluting the water for domestic use, and to permit them to remain at one place for any considerable length of time near the stream, where the accumulating filth naturally produced by them can drain into it, must unavoidably have the same effect. The filth and excrementitious matter coming from a number of animals, or even from one, if permitted to accumulate and get into the stream, must result in its pollution.

Again, the ordinance must receive a reasonable construction and application. Such a construction simply prohibits the owner of any cattle, etc., from permitting them to be so near a stream, whether it be ten or one hundred feet, or more

or less, which will result in appreciably befouling the stream. I think no one would insist that an owner of cattle should be punished for keeping his cattle at such a place, where their presence could have no effect on the purity of the water in the stream, although they were kept what may be termed to be "near" a stream. If therefore we keep in mind the purpose of the ordinance as an entirety, there is no difficulty in determining what is meant by the phrase "near the stream." The mere fact that the word "near" is coupled with the word "in"—that is, in or near the stream—clearly indicates that the intention was to prevent cattle, etc., from being and remaining in or so near to the stream as will result in polluting the water flowing therein. Nor does the ordinance apply to every stream, but it applies to such only from which the water is used by the inhabitants of a city. It is manifest therefore that to drive or keep any cattle, etc., at any place where they do not and cannot sensibly or appreciably pollute or befoul the water in the stream, does not come within either the purpose or the spirit of the ordinance. Suppose a stream were flumed or cemented, or otherwise protected by either natural or artificial means so that it was impossible for animals to get into the water, and that their filth could not pollute it, would any one contend that the ordinance was violated by merely permitting horses, cattle, or other animals to be near it? I think not.

This brings me to the crucial question in the case. Respondent's counsel contend that the complaint discloses that he is to be punished for doing or permitting a lawful thing upon his own land in the usual and customary manner, namely, the pasturing of his horses thereon. It is alleged in the complaint that the stream in question "runs through" respondent's land. He insists therefore that he is a riparian owner with all the rights and privileges incident to such ownership. Upon these premises his counsel insist that he at least has the legal right to make a reasonable use of his land and the acts charged do not show that he has abused that right. Indeed, they contend that the very acts charged merely show a reasonable and not an unreasonable use. Counsel have cited one case, namely, *Helfrich* v. *Catonsville Water Co.*, 74 Md. 269; 22 Atl. 72;

13 L. R. A. 117; 28 Am. St. Rep. 245, which seems to sustain their contention. That case, in my judgment, is, however, not so well considered as are the cases to which I have before referred. While the Maryland case may be applicable to the conditions prevailing in that state, yet it cannot be said that it can be applied to the conditions present in this state where pure water means life. By examining the notes to that case in 28 Am. St. Rep., it will be seen that the annotator also expresses some doubt respecting the soundness of the doctrine there announced. But assuming without deciding that reasonable use is the test, yet whether a use is reasonable, even as between riparian owners, depends largely upon conditions and circumstances. As has been well said:

"Whether the use to which he (the owner) wishes to devote it (the property) is reasonable must be determined by the circumstances." *Ferguson* v. *Firmenich Mfg. Co.,* 77 Iowa 576; 42 N. W. 448; 14 Am. St. Rep. 319.

To arrive at a just result, therefore, not only the local conditions and circumstances surrounding the *locus in quo* must be kept in mind, but, in my judgment, conditions generally prevailing throughout the state, or, at least, throughout the locality where the stream is located, and the uses to which the water flowing therein is applied, must also be considered.

Again, the doctrine laid down by Judge Cooley, in his excellent work on Constitutional Limitations, 7th Ed. 880, may also be important. It is there stated in the following words:

"So a particular use (or disposition) of property may sometimes be forbidden, where, by a change of circumstances, and without the fault of the owner, that which was once lawful, proper, and unobjectionable has now become a public nuisance, endangering the public health or the public safety."

The question is discussed by Mr. Justice Peckham, of the New York Court of Appeals, in the case of *Health Department* v. *Rector, etc.,* 145 N. Y. 32, 42, 43; 39 N. E. 833, 836, 837 (27 L. R. A. 710; 45 Am. St. Rep. 579). It is there said:

"Within this reasonable restriction the power of the state may, by police regulations, so direct the use and enjoyment of the property of the citizen that it shall not prove pernicious to his

neighbors or to the public generally.  *  *  *  Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances.    They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner.   If he suffer injury, it is either *damnum absque injuria*, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure.   (Citing cases.) The state, or its agent in enforcing its mandate, takes no property of the citizen when it simply directs the making of these improvements.   As a result thereof, the individual is put to some expense in complying with the law, by paying mechanics or other laborers to do that which the law enjoins upon the owner; but, so long as the amount exacted is limited as stated, the property of the citizen has not been taken in any constitutional sense without due process of law."

Therefore, whenever in this opinion I refer to a "reasonable use," I refer to one which is not of itself a nuisance or which does not unnecessarily and appreciably pollute the waters of a stream.   Further, that if in using property a stream is necessarily polluted and such pollution can be avoided without destroying the owner's ability to use the property, he must take reasonable steps and precautions to avoid such pollution, and, if he willfully or negligently fails to do so, he may be punished for his acts.   Any use which results in an appreciable pollution which is preventable by incurring reasonable expense or making reasonable effort cannot be deemed a reasonable use for the purpose of withstanding the enforcement of a police regulation which is intended to protect the public health.

But in answer to all this respondent insists that he is not charged with maintaining a public nuisance.   Whether he is or not, as I shall endeavor to point out hereafter, is not controlling here.   The real question is whether the use made by respondent of his land is a reasonable one under all the circumstances and within the purview of the rule heretofore laid down.   What use is it that respondent makes of his land, and under what circumstances is it applied?   The amount of land owned by him and on which it is alleged he keeps twenty-seven head of horses is so situated that the stream in question runs

through it. The amount of land is alleged to be fifteen acres but in what shape or form these fifteen acres lie and through what part the stream runs is not disclosed. For the purpose of this decision I shall assume that the land in question is a square piece of ground and is so situated that the stream runs through the whole of it from end to end or side to side, as the case may be. I do this for the purpose of giving respondent all possible advantage. If the stream in fact only runs through a small part of the land, then the rule that I shall apply is more favorable to him than it would be if the stream runs as I have assumed. If therefore the fifteen acres constitute a square piece of ground, the length of one side or one end thereof, as the case may be, must be within a few feet of forty-nine rods.

In view therefore that the stream divides the piece of ground, the horses at times must necessarily go from one side of the stream to the other to feed. In order to prevent the horses from polluting the stream by depositing their filthy excrement therein as charged in the complaint, they must be kept out of the water, and this I shall assume can be only done by erecting two fences, one on each side of the stream, with a fenced passageway which will permit the horses to pass from one side of the field to the other at will, or, by putting up bars through which they may be led or driven by some one from one side of the stream to the other as aforesaid. Assuming therefore that fences will have to be erected for the full length of the land the combined length of such fences will be about one hundred rods. In connection with this, some passageway must be devised for the horses to cross over the stream if they are to be kept entirely out of it. And in addition to the foregoing, some method by which water is provided for the horses to drink must also be devised. These things are so simple and in such general use that I may take judicial knowledge of the fact that their cost is, to say the least, not prohibitive, and, in view of the end to be attained, clearly not unreasonable. Will any one seriously contend that in this day and age it is necessary or even reasonable to permit twenty-seven head of horses, or any other number, more or less, to go into a stream and to deposit their filthy excretions

therein from day to day, the water of which stream is continually being used by a community of approximately 100,000 persons for culinary purposes? Would not all with one accord exclaim that, in order to keep this water reasonably free from pollution, it were better that the owner of the horses be required to provide water for them in some other way than by permitting them to go into the stream? It would seem that under such circumstances, to require the owner to have recourse to even the primitive method of carrying water with a bucket for some distance into an ordinary trough for the horses would be much more reasonable than the present method of going into and polluting the stream. But it is a matter of general knowledge that a much more convenient method without great expense, and one that acts automatically, can be devised to provide fresh water for the horses. Futher, can it successfully be maintained that, if the owner of the land is required to fence his horses away from the stream as suggested, he is unreasonably inconvenienced, or that his property is taken for public use?

I have devoted an unusual length of time an an unusual amount of labor to find some case in the books wherein it has been held that merely to inconvenience a landowner to the extent herein suggested, for the purpose and under the circumstances here present, constitutes a taking or confiscation of property; but I have found none. Moreover, the cases I have cited all squarely hold that a landowner cannot complain because he is inconvenienced in the use of his property, where such inconvenience arises out of the proper enforcement of the police power to protect the public health, and where such enforcement does not amount to the taking or destruction of his property. If such were not the law, communal life in this arid country would be well-nigh impossible. All the streams would be polluted and the use of the water made unwholesome, if not absolutely dangerous to health, by what is termed to be a reasonable use. Further, if the purity of the streams could only be maintained by compelling the cities and towns of this state to condemn the land along such streams, it would be necessary to condemn practically the whole watershed of the streams. This would be as impossible

as it is impracticable. Neither is such a course imperative, since the water in every stream may be kept reasonably pure and fit for even culinary use without entirely depriving a reasonable number of cattle, horses, and other animals from eating the grass which grows along the watershed of our streams. The whole matter can be regulated by giving a reasonable construction to our statutes and ordinances and by applying reason and common sense in their enforcement. If there is one subject which should be governed by reason and common sense more than any other, it certainly is the subject of police regulation.

The respondent insists that under the ordinance in question he cannot permit any of his horses to remain on any part of the land for the purpose of eating the grass growing thereon, since in doing so they still will void their excrement on the land, which, in case of rains and floods, will be washed into the stream. It no doubt is true that where there are filthy substances deposited along the sides of the canyons—and most of our streams flow through canyons—such substances, in case of rains, will, to some extent at least, be washed into the stream; but this is unavoidable. To permit cattle, however, or horses to deposit their excrement on the land while they are grazing all over it from day to day is one thing, while to permit them to go into the stream and to deposit it into the water, or to permit them to deposit it in any quantity near the stream where it will be directly washed into it, is quite a different thing. The cattle wander over the land during the summer season, and that is the only season in which they can be pastured, eating grass, and in doing so never deposit a very large mass of excrementitious matter in one place, but in the natural order of things will scatter it over an entire field or pasture. With regard to such deposits, the magic influence of sunlight and air which bring about chemical decomposition must not be overlooked. Most of the offensive gases escape under such conditions, and as pointed out by Vice Chancellor Stevens in the case of *Doremus* v. *Paterson*, 73 N. J. Eq. 483; 69 Atl. 225, where the question now under consideration is exhaustively treated, only the solids or the mineral portions of the excrementitious matter eventually find their way into the

stream and these ordinarily are either harmless or settle down so as to become so. From these sources, therefore, the stream, provided it carries any considerable quantity of water, is not sensibly or appreciably polluted, and thus not made unfit for use.

Recurring now to the claim made by counsel that respondent is not charged with committing a nuisance. It is true that such is not the direct charge, but can it be said that to permit twenty-seven horses to go into a stream each day during the summer season, and to permit them to deposit their filthy excrement into the water flowing therein which is being used for culinary purposes by the inhabitants of a large city, if not a nuisance *per se* is, nevertheless, near the border line of constituting a very offensive one? If respondent, however, were either actually committing or maintaining a nuisance, he would not have any standing in court whatever. His counsel frankly concede that if he were guilty of maintaining a public nuisance it could be abated, and this, too, without considering whether the abatement would injuriously affect him in his property rights or not. But they strenuously insist that what is charged does not amount to a nuisance. Let me say here, once for all, that statutes and ordinances such as are in question here do not depend for their enforcement upon the question of whether the acts that are prohibited thereby constitute a nuisance or not. If such acts constituted a nuisance, the parties charged, if the acts came within the statute or ordinance, would be guilty as a matter of course, but they may also be found guilty although the acts do not, as yet, amount to a nuisance. If respondent were guilty either of committing or maintaining a nuisance, the city, under the common law, as a mere riparian owner, could require him to abate the same, or the board of health might do so. In either case it would be wholly unnecessary to have recourse to an ordinance like the one in question. Such ordinances are not enacted to prohibit the maintenance of existing nuisances; but their enforcement is intended to prevent the creation of nuisances which may become dangerous to the public health. If no one could be prevented from polluting water until his acts amounted to the committing or maintaining of

a public nuisance, then police regulations to prevent the pollution of our streams would be almost entirely shorn of their beneficial effect, and much harm to the public health would be possible, which, by the enforcement of such ordinances, is or may be prevented. To this effect are all the cases to which I have referred herein.

Whether respondent has violated the provisions of the ordinance in question or not is a question of fact. He cannot be found guilty under the charge preferred against him unless it is found beyond a reasonable doubt that he has permitted the acts complained of and that such acts sensibly or appreciably pollute or have polluted the stream. The pollution must be one which constitutes an appreciable befouling of the water, because in the very nature of things it was not intended to punish for a mere technical contamination or pollution of water. Such a pollution is not preventable. Impure, noxious, or offensive matter cast into a stream, however small in quantity, to some extent pollutes the water therein. That, however, is not the pollution which ordinances like the one in question seek to prohibit or punish. On the other hand, such ordinances are intended to prevent the deposit of filthy substances in or near our streams, which, if continued, might seriously endanger the public health. These ordinances are also intended to prevent individuals, by independent action, from polluting streams, although their acts cannot be construed as amounting to a nuisance. If the courts should refuse to enforce such ordinances, then each one of a number of individuals acting independently who own lands along a stream might pollute it, but not to such an extent as to constitute a nuisance, while the combined acts of all would so pollute the water of a stream as to make its use dangerous to health, and yet none could be punished, because the individual and independent acts taken singly would not so pollute the stream as to constitute a nuisance or make the use of the water necessarily dangerous to health.

I desire to add here that in the nature of things it is not possible for me to say, upon this demurrer, whether respondent is so affected in the use of his land as to amount to a taking as he contends. From the face of the complaint, no

such result is discernible. The acts that are sought to be prohibited clearly come within police regulations, and, unless the prohibition of the use of his property in the manner it is used is tantamount to a taking of it or which deprives him of the use thereof, he cannot complain. Although he were found guilty and then were prohibited from using his property in the manner complained of, yet he would not, by reason of that fact, be prevented from seeking or from obtaining redress in the proper courts in this state, provided the prevention aforesaid would result in preventing him from making a reasonable use of his property as such reasonable use is herein defined.

I am constrained to hold therefore that, for the reasons stated, the ordinance in question is not invalid; that the statute on which it is based is a valid statute; and that the complaint states sufficient facts to constitute a public offense.

The judgment of the district court is therefore reversed.

STRAUP, C. J. (concurring).

It undoubtedly was within the province of the Legislature to confer power upon municipalities by ordinance to protect waters of streams used by the inhabitants thereof for domestic and culinary purposes, and to prevent pollutions of such waters. Whether the ordinance in question, in all its parts, is within such conferred power, need not, as I view the matter, be now considered or determined. It is sufficient to ascertain, and the inquiry need be no broader, as to whether the acts or wrongs alleged in the complaint are such as the municipality under its conferred power could and did by ordinance forbid and penalize. Certain it is that a municipality, by ordinance, under the conferred power, may forbid and prevent pollutions, and punish those committing them, which result from an unlawful, wrongful, negligent, unreasonable, or unnecessary use of, or interference with, such waters, or of premises through which they course or are adjacent to them. Whether the municipality under such conferred power may also forbid and prevent pollutions—a very flexible and comprehensive term, for any feces or refuse getting in the water of a stream may, in a degree, constitute a pollution—and pun-

ish those committing them, which result wholly from a lawful, careful, reasonable, and proper use of such premises by the owner or an occupant thereof, is a question concerning which I entertain serious doubt. The ordinance, however, seemingly forbids the one as well as the other. The location and physical conditions of premises of an owner, and of the stream coursing through or near them, may be such that to pasture or keep any animals, such as horses or cattle, on the premises, would necessaritly result in pollutions of the waters to some extent, for it must be conceded that any appreciable quantity of feces washing or getting into the stream would in some degree injuriously affect the purity and potability of its waters. Hence it may well be questioned whether a municipality, under the conferred power, by preventing and penalizing such an act, under such circumstance would not deprive the owner of a rightful use and enjoyment of his property and thus, in effect, amount to a taking or damaging of property without compensation.

But the complaint, in effect, charges a wrongful, negligent, unreasonable, and unnecessary use of the waters of the stream and of the premises through or along which it courses; the complaint in such particular being that the defendant, "unlawfully and willfully, * * * and continuously, for ten days or more," permitted, "at all times," twenty-seven horses to pasture upon and along the banks of the stream, to wade in and drink therefrom, and to "drop their dung into said creek." That pretty nearly charges that the defendant willfully, unlawfully, and continuously, for a period of ten days or more, used the stream as a depository for horse feces. I think the acts charged in the complaint are such as the municipality, under its conferred power, could by ordinance prohibit, and are such as are forbidden by the ordinance; and therefore that the demurrer to the complaint ought to have been overruled.

McCARTY, J.

I concur. I am of the opinion that the complaint is not vulnerable to the objections urged against it. That the Legislature may confer upon municipalities the power generally

to protect from pollution streams of water used by the inhabitants for culinary and domestic purposes is no longer an open question. A municipality may not, however, in the exercise of its police power in that regard, destroy or appreciably impair the value or utility of vested rights of others in and to such streams. It is common knowledge that municipalities throughout this state, with but few exceptions, obtain the culinary water used by the inhabitants thereof from streams of water that have their sources in the mountains and which flow through canyons to the valleys and lowland where it is diverted for the uses mentioned. It is equally well and generally known that, in many of the canyons through which these streams of water flow, there are, at different points, small tracts of meadow, pasture, and arable land ranging in quantity from a fraction of an acre to a quarter section or more which usually extends back from either side of the stream to or near the base of the walls of canyons. Much of these lands, because of their altitude and close proximity to the mountain ranges and public grazing lands, are specially valuable for raising hay, and for grazing, pasturing, and feeding cattle, horses, and other domestic animals, and, in a limited way, for raising grain, potatoes, and a few other cereals that grow and thrive in high altitudes and that are indispensable in the maintenance of a cattle and horse ranch.

There may be, and no doubt are, instances where parties, at an early date in the settlement of this arid mountain region, homesteaded tracts of these lands and have fenced and otherwise improved the same, and have occupied and used the lands for raising hay, pasturing, grazing, and corralling cattle, horses, and other domestic animals, and have used the waters rising thereon and that flow through the premises for irrigation, culinary, and domestic purposes, before parties lower down on the stream acquired any interest in or title to the water. In such case, the homesteader and his successor in interest may, after a municipality acquires a right to the water, after it leaves the premises, for the use of its inhabitants, continue to make a reasonable use of the land for the purposes mentioned. He may farm the land, pasture, graze, and corral horses, cattle, and other domestic animals thereon,

to the same extent as he did before the municipality acquired
an interest in the water. And if in making such reasonable
use of the land the drainage therefrom finds its way into the
stream, which under the circumstances and conditions men-
tioned is generally unavoidable, he is not amenable to either
the criminal or civil law. In such case the municipality has
a remedy, and may, under the eminent domain law, acquire
an easement or title to the land, or a sufficient amount thereof,
bordering on the stream, to enable it to protect the water from
pollution. Section 22 of Article 1 of the Constitution of this
State provides that "private property shall not be taken or
damaged for public use without just compensation." A mu-
nicipality, under the conditions such as I have suggested, can-
not evade this prohibitory provision of the Constitution and
directly or indirectly deprive a party of his property or mate-
rially impair the value thereof by restricting its use without
compensating him for the property taken or the damage sus-
tained.

It is suggested that in the case at bar respondent might at
a nominal expense construct a fence along either side of the
creek where it passes through his land, and thereby protect
the stream from the pollution mentioned in the complaint.
As I have stated, it is common knowledge that the meadow,
pasture, and arable lands in the canyons through which these
streams of water flow is limited to small tracts situated along
the beds of the canyons. In many instances this land consists
of narrow strips on either side of the creek. There may be,
and no doubt are, instances in which the homesteader, in order
to include in his entry as much of this tillable land as possi-
ble, has "taken up"—filed on—two, three, or more contiguous
"forties" along the bed of the canyon. In such case the home-
stead may consist of a tract of land eighty rods in width and
320 rods (one mile) in length. Under these conditions, it
would require two miles of fence to prevent the loose animals
kept on the ranch from going into the stream at will. To con-
struct and maintain such a fence would not only be expensive
to the homesteader, but in many cases the fence would very
materially impair the usefulness of the ranch and thereby de-

crease its value. This is an expense—a burden—that the municipality cannot, either under the Constitution, statute, or its police power, compel the owner to assume. If, under such circumstances, the municipality may prevent the homesteader, or his successors in interest, from pasturing animals on the portion of the ranch through which the stream of water flows (which may be the only part of the premises fit for pasturage), it necessarily follows that the municipality may also prevent the irrigation of the land because the waste water therefrom unavoidably flows into the creek, washing therein the offal of animals and other refuse, such as manure, debris, etc., hauled from the corrals and yards, and scattered over the arable portion of the ranch to fertilize the soil. The fact that the municipality may, in some cases, be compelled, as suggested, to purchase or acquire by condemnation proceedings entire watersheds in order to protect the stream from pollution, does not relieve it from doing what the provision of the Constitution referred to requires, namely, compensate the owner for his property or so much thereof as may be necessary for the municipality to acquire in order to enable it to protect the stream from the impurities mentioned.

What I here state is in no sense in conflict with the case of *People* v. *Burtleson*, 14 Utah 258; 47 Pac. 87. In that case the defendant was convicted of having committed a public nuisance by unlawfully and willfully driving, herding, and keeping about 2,000 sheep upon a small stream of water which was used by the inhabitants of a small town or village. The record in that case, what there is on file in this court, shows that the defendant was herding and grazing his sheep on the public domain at the time he committed the nuisance for which he was convicted.

I do not wish to be understood as holding that a party may go upon the public domain and acquire title to land through which a stream of water flows that is being used by the inhabitants of a municipality for culinary and domestic purposes and make any use of the land that will result in befouling the water. Nor do I wish to be understood as holding that in cases where a party, or his predecessor in interest, was the first to locate on a stream of water and acquire title to land through which it flows, and later other parties lower

down on the stream appropriate and make use of the water for culinary and domestic purposes, the first appropriator, or his successor in interest, may, in the use he makes of his property, willfully or wantonly pollute and befoul the water of the stream. He may not maintain thereon, corrals, stables, privies, outhouses, pigsties, or a slaughterhouse where the drainage therefrom will naturally find its way into the stream. What I do say is that where a party files on public land through which a stream of water flows, fences, tills, and otherwise improves the land, and makes the same use of it as is usually made of land of that character, such as farming, raising hay, pasturing and feeding cattle, horses, and other domestic animals, and a municipality or its predecessor in interest later on acquires a right to use the water after it leaves the premises for culinary and domestic purposes, the municipality may not compel the owner of the land to dispense with one or more uses to which the land is peculiarly and specially adapted, and to which it has been devoted, because such use unavoidably befouls the water. To arbitrarily prohibit the owner of a ranch from pasturing his animals thereon and making the same use of it as ranch property situated in the mountains is generally devoted, or to impose conditions that would make such use impracticable, would in effect be, at least, a partial confiscation of the property. This, neither the State nor any political subdivision thereof can do without disregarding and overriding the provision of the Constitution herein set forth.

Whether the respondent is within his rights in pasturing horses in the inclosure through which the stream of water in question flows depends on the circumstances and conditions under which he is using the land for that purpose. Of course, if he willfully and wantonly permits twenty-seven or any number of horses in his pasture to wade into the stream at will and befoul the water under conditions that would enable him at a nominal expense and with but little inconvenience to protect the stream from pollution, he is amenable to the ordinance under which he is being prosecuted, regardless of whether his right to pasture his land antedates the right of the municipality to the use of the water.