# BOUNTIFUL CITY v. DE LUCA et al.

No. 4883. Decided October 10, 1930. (292 P. 194.)

108

See also 292 P. 205.

*O. W. Moyle* and *H. W. Rudine,* both of Salt Lake City, for appellants.

*Irvine, Skeen & Thurman,* of Salt Lake City, for respondent.

STRAUP, J.

This action was brought by Bountiful City to restrain the defendants from keeping or grazing goats or other live stock within 300 feet on either side of a creek known as Stone creek, its tributaries and sources of supply, some of the waters of which are used by the city and its inhabitants for culinary and domestic purposes; and from permitting goats or other live stock to drink out of such creek of any of its tributaries or sources of supply and from in any manner contaminating or befouling any of such waters. The plaintiff was given judgment so restraining the defendants, from which they have prosecuted this appeal.

The case was tried to the court without a jury. The material findings are assailed as not being supported by sufficient evidence, that the conclusions are not justified either by the findings or by the evidence, and that the judgment as rendered, in effect, amounts to a taking of property, or a deprivation of the use and enjoyment of it for any and all purposes for which it may be used, without compensation and without due process of law and in violation of both the federal and state Constitutions. The judgment is justified by the city under the claim of police powers conferred upon it by the Legislature to prevent a pollution or contamination of waters used for culinary and domestic purposes and to abate and prevent nuisances.

The defendants own about 560 acres of grazing lands in section 21, etc., in Davis county and located below the mouth

of a canyon and along the foothills of mountains east of Bountiful City. The western boundary of the lands is near the eastern boundary of the corporate limits of the city. Stone Creek, a natural stream of water, has its source in the mountains about five miles east of the city and flows down the canyon in a westerly direction through the entire width or length of the lands of the defendants and continues in a northwesterly direction north of the city. The distance the stream runs through the defendants' lands is about a mile. The stream is from 4 feet to a rod wide. The eastern portion of the defendants' lands is somewhat rough and rather steep. The western portion of it is more level with gulches running through it. The land is also rather steep on the south side of the creek, but not so steep and more level on the north side. Most of the lands from the north and south drain towards the creek which runs through the lands of the defendants east and west. All of the lands are covered with grass, brush, and some trees. They are suitable only for grazing purposes and not capable of being used for any other purpose. The best part of the lands lie near the creek which flows through them and better feed is found there than higher up the hill or mountain side.

About two miles sourth of Stone creek is Barton creek which also has its source in the mountains and flows westerly towards and in the vicinity of the city, the waters of which are also used by it for culinary purposes. The mountain ridges between Barton and Stone creeks make a sort of watershed from which waters from rainfalls and melting snows drain toward Barton creek on the south and towards Stone creek on the north. The ridges north of Stone Creek and of the defendants' lands also make a sort of watershed from which waters from rainfalls and melting snows drain towards Stone creek. The lands owned by the defendants and lands adjoining and adjacent to the east, the south, and to the north thereof, for more than forty years, have been used for grazing purposes and are not suitable for or adaptable to any other use. More or

less dung from animals grazing on the defendants' lands and on the lands adjoining and adjacent thereto, from freshets, heavy rainfalls, and melting snows, drains towards Stone creek and washes into it. The defendants acquired their lands in 1918 from the Deseret Live Stock Company, who, and its predecessors, for many years used the lands and lands adjoining and adjacent thereto for grazing sheep and some cattle. The defendants, from the time they acquired their lands, and until the commencement of this action, used them for grazing from three to five hundred head of goats and were engaged in selling goat milk and manufacturing cheese and other products from goat milk. They built on their lands substantial dwelling houses where they with their families resided, and constructed other buildings and improvements thereon used in connection with the business carried on by them, to the value of $10,000 or more. All of the waters of Stone creek had been appropriated by the Stone Creek Irrigation Company and its predecessors for many years prior to the defendants acquiring their lands. The city owns one-fourth of the capital stock of the irrigation company and is entitled to one-fourth of the waters of the creek which it uses for culinary purposes for its inhabitants.

The defendants, as appropriators, do not claim any right or interest in or to the waters of the creek. They, however, as owners of lands abutting the creek, and as riparian owners, claim acquired rights to water their goats from the creek, and also claim such right by prescription and adverse usage. It is shown that the city by open ditches used water from the creek for culinary and domestic purposes for many years prior to the defendants acquiring their lands. Later, the city constructed an intake on the defendants' lands and piped water therefrom to its reservoir, but it is not shown whether the intake was constructed before or after the defendants acquired their lands. Let it be assumed it was constructed before. It is constructed near the western boundary of the defendants' lands. It

consists of an open cement box, with a wooden headgate which may be raised and lowered to regulate the flow of the water. From the headgate, the city, by means of a pipe line, carries its water for a distance of but half a mile to a reservoir south and west of the creek where the water enters the distributing system of the city. About five years prior to the trial of this action, which was in December, 1927, a bridge about 200 feet below the intake was constructed across the creek by means of which the defendants' goats crossed from one side of the creek to the other. For a few years after the defendants acquired their lands, and before the bridge was constructed, the goats drank from and crossed the creek indiscriminately above as well as below the intake. But after about the year 1921 or 1922 and until about 1925, the goats drank from and crossed the creek below the intake. In some years, and in seasons when the waters in the creek were low, the city, at the intake, took all of the water from the creek so that no water coursed down the creek below the intake. On such occasions the defendants raised the headgate at the intake and let sufficient water down to water the goats below the intake. In 1925 the watermaster and agents and officers of the city forbade the defendants so letting water down, and accused them of stealing water. The defendants thereupon ceased to let water down, and after that, when no water flowed below the intake, the goats watered and drank from and crossed the creek indiscriminately above the intake.

Under the laws of this state (Comp. Laws Utah 1917, § 570x15, as amended by Laws Utah 1923, c. 11), cities of the class of Bountiful City, among other things are authorized to construct waterworks within or without their corporate limits, and for the purpose of maintaining and protecting the same from injury or pollution, their jurisdiction is extended over the territory occupied by such works, and over all reservoirs, streams, etc., used in and necessary for the maintenance and operation of such works, and over streams and sources from which the water is taken for

fifteen miles above the point from which it is taken and for a distance of 300 feet on each side of the stream or water source within fifteen miles. Such cities are also authorized to enact ordinances and regulations necessary to carry the conferred powers into effect and to prevent pollution or contamination of streams or water sources from which inhabitants of cities derive their water supply, in whole or in part, for domestic and culinary purposes.

In 1924 the city passed an ordinance which, among other things, provides that the watershed area of the city is defined to be the entire area in any canyon above the intake of the city within which water drains into any stream or tributary thereof, where such stream of water is taken by the city into its waterworks system for culinary and domestic purposes, and, among other things, provides that it shall be unlawful for any person to permit any loose cattle, horses, sheep, or any other animals, to run at large except where such live stock are more than 300 feet from any stream or source of water supply within the watershed area, or to permit horses, cattle, sheep, hogs, or other animals to water directly from the stream, or to remain in or near or to pollute any such stream of water. The ordinance does not in direct or express terms forbid the grazing of lands within the 300-foot limit.

The unlawful acts charged in the complaint, and as found in the language of the complaint, in substance are that since the defendants have acquired their lands they have kept thereon cattle, sheep, and goats from three to five hundred head and have used or permitted to be used their lands for the purpose of corralling and bedding cattle, sheep, and goats and have herded and permitted them to be herded in and through Stone creek, at points in close proximity where waters therefrom are diverted by a pipe line to the city; that filth and dung deposited by cattle, sheep, and goats upon defendants' lands, in corrals and bedding places, have been permitted to wash down to and into the stream and to pollute and contaminate the same; that such animals,

along and through the stream and upon the banks thereof have deposited filth and dung into the stream and have waded and washed themselves therein; that the animals have been so herded and grazed upon such lands and adjacent to and in the stream during the major portion of each year for a number of years preceding the commencement of the action; and that they are now being herded, grazed, corralled, and permitted to be herded, grazed, and corralled along, adjacent to, and in the stream, and by reason thereof the waters of the stream have become contaminated and polluted and rendered unfit for domestic and culinary purposes; and that the defendants have declared their intention to continue to so use their lands and to so graze and herd cattle, sheep, and goats thereon along and in and across the stream and to continue the deposition of filth and other polluting and contaminating substances therein.

Upon such alleged and found acts the court undoubtedly was justified in restraining the commission of them. The defendants do not contend to the contrary. The decree as rendered perpetually restrains the defendants from permitting cattle, sheep, and goats to drink from or wade in or through Stone creek or its tributaries or sources of supply or from corralling, grazing, herding, driving, maintaining, or holding cattle, sheep, or goats within 300 feet of either side of Stone creek, its tributaries and sources of supply.

There is no evidence to show that the defendants grazed any sheep or cattle or other animals on their lands, except goats. In such particular the findings are not supported by the evidence. It is also contended by the defendants that the findings that they corralled or bedded or held goats or any animals within 300 feet of the stream or any tributary thereof or of any source of supply also is not supported by the evidence. The defendants, however, admit they grazed goats on their lands within 300 feet of Stone creek and that they were forbidden to water their goats from the creek below the intake by letting sufficient water down from the intake for that purpose, they watered their goats

from the creek above the intake and claimed the right without causing unnecessary injury to or pollution of the waters of the stream, to so water them, and claimed the right, in the exercise of reasonable care and diligence, and without causing any unnecessary or unreasonable pollution of the waters of the creek or any of its tributaries to graze their goats within the 300-foot limit.

There is no evidence to show that the defendants corralled or bedded or held the goats or other animals within 300 feet of the creek. The evidence shows that one of the corrals maintained by the defendants was about one-half mile from the creek and south and west of and below the intake and another corral 450 feet from the creek and north and west of and below the intake, and that a drain ditch was constructed between that corral and the creek. There, however, was evidence to show that at the commencement of this action and for some time prior thereto, for about 100 feet or more above the intake, there was a considerable amount of goat dung on the banks of and near the creek, and more or less dung near the creek for a considerable distance farther above the intake, and that some of such dung from rainfalls and melting snows washed or found its way into the creek and contaminated and polluted the waters of the creek. There also was evidence to show that several years prior to the commencement of this action, one or two dead goats were found near the creek and one of them in the creek. The defendants disclaimed knowledge of any such facts and disclaimed any right to permit any dead animals to be or remain on their lands or near the creek or any source of its supply. There was further evidence to show that a short time before the commencement of this action six or more officers and agents of the city, one afternoon at about 4 o'clock, and at a time of day the goats ordinarily were driven from lands north of the creek and to the corral on the south of it, secreted themselves at different places just below and near the intake and where the goats ordinarily crossed the creek, and there waited the approach of

the goats as they were being driven toward them by a herder. Some of the persons so secreted testified that as the goats approached the creek below the intake the goats either saw or scented the presence of the persons so secreted, hesitated a moment, and then went above the intake a short distance and there by the herder were permitted to enter the stream, drink therefrom, and that some of them dropped dung and urine in the stream. The goats were held there by those who had been so secreted, until the herder, at their request, went to the residence of one of the owners near by to notify him to immediately come to the intake where the goats were. In about a half hour or more the owner arrived. In the meantime photographic pictures were taken on behalf of the city showing the goats in the creek and drinking water therefrom. The pictures were put in evidence. When the owner arrived he was asked to sign writings so as to avoid taking the goats to the estray pound and depriving him from milking them. Evidence was also given to show that samples of water were taken from the reservoir and from the creek above the intake while the goats were in the creek, and that such samples contained from 130 to 250 bacteria to the cubic centimeter, and that according to government regulations water containing more than 100 bacteria per cubic centimeter was unwholesome and injurious for culinary purposes, and that colon bacillus was usually found in the intestines and digestive tracts of animals, and taken into the human system through drinking the water, brought about an inflammation of the digestive tract and increased susceptibilities to disease. The evidence also shows without dispute that the lands of the defendants are suitable only for grazing purposes and cannot profitably be used for any other purpose and that no water was to be had for watering livestock on or in the vicinity of the defendants' lands, except from waters of the creek, and that all of such waters for many years had been appropriated for irrigation of lands down the valley below the foothills and for culinary purposes used

by the city, but that the defendants and their predecessors in interest for more than forty years watered their live stock from the creek and its tributaries by permitting animals to drink directly therefrom.

Now, it is the contention of the defendants that inasmuch as their lands are suitable and adaptable only for grazing and may not profitably be used for any other purpose, the decree, perpetually restraining them from grazing their lands within 300 feet of either side of the creek, constitutes a taking without compensation and without due process of law of about 600 feet of their lands for a distance of a mile or more, or a taking of about 72 acres, in violation of both the state and federal Constitutions. They further contend that inasmuch as no water is to be had to water live stock kept and grazed on any other portion of their lands, except from the creek or its tributaries, the decree, restraining them from permitting the goats at any place to drink out of the creek or of any of its tributaries or source of supply, prevents them from grazing any portion of their lands and from carrying on their business of selling milk and manufacturing cheese and other products and from grazing any of their lands, thus not only destroying the entire use and enjoyment of their lands, but also the permanent and valuable improvements made thereon by them.

That in the main such results may follow by enforcing the decree is not seriously disputed by the city. In reply thereto it in effect asserts that such results are but direct and necessary consequences from a lawful exercise of the police power and hence cannot be considered as a taking of or damaging property without compensation or without due process of law, within the meaning of the state or federal Constitution. It is not so much contended by the defendants that the ordinance is invalid as not being within the power of municipalities conferred upon them by the statute, but rather that the statute respecting the subject and the ordinance in pursuance thereof, and especially the decree, transcend article 1, §§ 7 and 22, of the Constitution of Utah

providing that no person shall be deprived of property without due process of law and that private property shall not be taken or damaged for public use without compensation, and section 1 of the Fourteenth Amendment to the Constitution of the United States that no state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States nor shall any state deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

It is the contention that the decree invades and deprives the defendants of such guaranteed rights. In such connection it also is argued by the defendants that they, as riparian owners, acquired a right to water their goats out of the creek, so long as they exercise reasonable care in such respect and do not unreasonably or unnecessarily, or negligently injure rights of others, and that they cannot be deprived of such right without compensation and due process of law. The common-law doctrine of riparian owners does not obtain in this state. *State* v. *Rolio* (Utah) 262 P. 987. Under our laws, rights in and to the use of public waters, or of a natural stream or source, may be acquired only by appropriation and by an actual diversion of waters from the natural channel or stream and a beneficial use made of them and as by our statutes provided. Neither the defendants nor their predecessors made any diversion of the waters of the creek for watering live stock or for any other purpose. They, without any diversion, merely permitted animals to drink directly from the creek. That gave them no right to or possession of the use of the waters, for as said by the author, 2 Kinney on Irrigation and Water Rights, 1242, that as:

"no possession or exclusive property (of water) can be acquired while it is still flowing and remaining in its natural channel or stream, it follows, therefore, that in order to obtain possession of the water attempted to be appropriated, it is an indispensable requisite that there must be an actual diversion of the water from its natural channel into the appropriator's ditch, canal, reservoir, or other structure."

Cases are there cited in support of the text. While our statute (Laws Utah 1919, c. 67, § 10) provides that:

"in times of scarcity, while priority of appropriation shall give the better rights as between those using water for the same purpose, the use for domestic purposes [which includes watering livestock] shall have preference over use for all other purposes"

and

"use for agricultural purposes shall have preference over use for any other purpose except domestic use,"

still, since the defendants made no diversion of the waters, they acquired no rights by appropriation for any purpose, and though they had acquired a right to water live stock it would not be paramount to the acquired right of the city using its waters for culinary and domestic purposes for its inhabitants, but would be subordinate to the prior appropriation or acquired right of the city.

The proper disposition of the case thus involves the question of whether the statute, the ordinance in pursuance thereof, and the decree, constitute a reasonable regulation to protect and to promote public health, public safety, general welfare, etc., within the lawful exercise of the police power, or whether the statute and the ordinance and the decree in pursuance thereof, in the particulars complained of, do or do not amount to a taking or deprivation of property without compensation or due process of law forbidden by the constitutional provisions referred to.

Broad and comprehensive as are the police powers of the state, still we think it may not successfully be contended that the power may be so exercised as to infringe upon or invade rights safeguarded and guaranteed by constitutional provisions. We so held in the case of *Logan City* v. *Public Utilities Commission,* 271 P. 261, citing 12 C. J. 1928, 6 R. C. L. 195. The difficult question in such respect which ordinarily arises is: When, in the exercise of the police power property or a business is affected, may it be said that the power as exercised is a mere reasonable

regulation, and not a taking or deprivation of property within the meaning of constitutional provisions? The cases are numerous to the effect that the Fourteenth Amendment to the federal Constitution was not intended to limit or hamper the states in the legitimate exercise of their police powers; that every one must use his property so as not to unreasonably or unnecessarily injure others, and that he holds his property and the use and enjoyment of it subject to a reasonable and lawful exercise of the police power and to such reasonable restraints and regulations over it as the legislature within its governing and controlling power vested in it may deem necessary and expedient to protect and promote public health, public safety, morals, and general welfare; that the state may without compensation regulate and restrain the use of private property when the health, safety, morals, or welfare of the public requires or demands it; that the Legislature may authorize many things to be done which create disturbance, annoyance, discomfort, and affect health, which must be endured by private parties without compensation, unless some constitutional mandate is violated; that the due process clause of the federal Constitution does not operate to deprive the states of their lawful police powers or of the right in the exercise of such powers to resort to reasonable methods inherently belonging to the power exerted, its effect being only to restrain those arbitrary and unreasonable exertions of power which impair or destroy fundamental rights; that the exercise of proper police regulations may to some extent prevent enjoyment of individual rights in property or cause inconvenience or loss to the owner, does not necessarily render the police law unconstitutional, for the reason that such laws are not considered as appropriating private property for a public use, but simply as regulating its use and enjoyment, and if the owner through a lawful exercise of the power suffers inconvenience, injury, or a loss, it is regarded as damnum absque injuria, provided, always, that constitutional mandates have not been invaded by a confiscation, destruction,

or deprivation of property, unless it is per se injurious or obnoxious or a menace to public health or public safety or morals or general welfare, or unless under conditions similar to tearing down a building to prevent spreading of a conflagration; but however broad the scope of the police power, it is always subject to the rule that the Legislature may not exercise any power expressly or impliedly forbidden by constitutional provisions. Cases supporting such views are noted in 2 L. R. A. Digest, p. 2068 et seq.; 6 R. C. L. 183 et seq., and 12 C. J. 904 et seq.

The case of *Salt Lake City* v. *Young*, 45 Utah 349, 145 P. 1047, 1051, Ann. Cas. 1917D, 1085, cited and relied on by both parties, is, as we think, in line with such views. The case is cited by the city as an authority to the effect that in the exercise of the police power to promote and protect public health, etc., a municipality may not only regulate and restrain the use and enjoyment of property and by so doing interfere with property rights, but may also, if it deems the exigency of the case requires, without compensation, take or destroy private property for public use, or wholly deprive the owner of the use and enjoyment of it, though the property may not per se be injurious or obnoxious to public health, etc. We think the case, to the extent contended for, is misconceived. Mr. Justice Frick, writing the prevailing opinion, among other things, said that courts will interfere if the exerted police power is in contravention of constitutional provisions. He further says that,

"if in using property a stream is necessarily polluted and such pollution can be avoided without destroying the owner's ability to use the property, he must take reasonable steps and precautions to avoid such pollution, and, if he willfully or negligently fails to do so, he may be punished for his acts."

He again says that,

"Moreover, the cases I have cited all squarely hold that a landowner cannot complain because he is inconvenienced in the use of his property, where such inconvenience arises out of the proper enforcement of the police power to protect the public health, and where such

enforcement does not amount to the taking or destruction of his property." .

In the concluding portion of his opinion he further observes:

"I desire to add here that in the nature of things it is not possible for me to say, upon this demurrer [the case went off on demurrer] whether respondent is so affected in the use of his land as to amount to a taking as he contends. From the face of the complaint, no such result is discernible. The acts that are sought to be prohibited clearly come within police regulations, and, unless the prohibition of the use of his property in the manner it is used is tantamount to a taking of it or which deprives him of the use thereof, he cannot complain."

There certainly is not anything in either of the concurring opinions which lends support to the broad contention of the city. They, too, are against it. Thus this court is committed to the doctrine that while the state, or an arm of the state to whom the power is delegated, may, under its police power, by reasonable methods regulate and restrain the use of property but may not, without compensation, deprive the owner of all profitable use of it not per se injurious or pernicious.

That under the police power it was competent for the Legislature, and without transcending the constitutional provisions referred to, to regulate and control streams and their tributaries and sources of supply, the waters of which are used for culinary and domestic purposes, so as to protect and prevent the waters from being contaminated or polluted or rendered unfit for consumption, and to delegate such powers to municipalities, and that such powers may be exercised within reasonable limits and without compensation, though in the exercise of them the use, enjoyment or restraint of property may be affected or inconvenienced, or loss suffered by the owner, may not be doubted. To protect such waters and to prevent a pollution of them is a public necessity. We think the statute is not, nor the ordinance founded upon it, an unreasonable regula-

tion when properly and reasonably applied and enforced. The appellants do not, nor could they successfully, complain of restraints put upon them to prevent an unreasonable or unnecessary use of their premises, or of corralling, or bedding, or holding or keeping goats or other live stock on or near the banks of the stream, or within the 300-foot limit, or at any place, where dung or offal of animals, or other refuse, may wash or find its way into the stream and which in the exercise of all reasonable care and caution may be avoided.

What the defendants contend is that when they make a reasonable and careful use of their premises and exercise all reasonable care and caution to prevent contamination or pollution of the waters, they may not, without compensation, be deprived of all profitable use and enjoyment of any part of their lands, though in the exercise of such care dung to some extent from goats or other animals grazing on their lands, including the 300-foot limit, unavoidably may find its way into the stream and to some extent contaminate or pollute its waters. That in herding and grazing goats or other live stock, though with reasonable care and caution, along a stream within the 300-foot limit, more or less dung from the animals by rainfalls and melting snows is likely to find its way into the stream, and may result in the animals drinking directly from it, all of which in a more or less degree tend to contaminate or pollute the waters and render them unfit for consumption, is not seriously disputed. Were the use of the defendants' lands suitable or adaptable for any other legitimate purpose without causing such or other harmful effect upon the waters, we think there would not be much question but what the city, under its police powers and without compensation and without transcending any of the constitutional provisions, could prevent the grazing or herding of any live stock within the 300-foot limit. May it do so when the result thereof is to wholly deprive the defendants from all profitable use and enjoyment of such lands?

That the city, by condemnation and compensation, may do so is clear. That it may do so under its police powers and without compensation is not so clear. In either event the exerted action, if it does not constitute a taking of property, under the undisputed facts, constitutes a deprivation of all profitable use and enjoyment of the property. In 12 C. J. 905, the author says that

"the police power is usually exerted merely to regulate the use and enjoyment of property by the owner, or, if he is deprived of his property outright, it is not taken for public use, but rather destroyed in order to promote the general welfare of the public, and in neither case is the owner entitled to any compensation for any injury which he may sustain in consequence thereof,"

the injury in such case being in law considered as damnum absque injuria. The author in support thereof cites cases from many jurisdictions. Most of the cases deal merely with the question of regulations as to the use, enjoyment, or restraint of property, such as to prevent offal from slaughterhouses, refuse from manufacturing plants, sawdust from sawmills, garbage from hotels and restaurants, and other obnoxious matters from being cast into streams or lakes or the maintenance of sties, pens, or corrals on or near thereto, the waters of which are used by the public for culinary purposes; to prevent bathing in and boating on waters of public reservoirs; to compel property owners to connect with public sewers, and to maintain levees to prevent overflow of streams; to fill up low lands injurious to public health; to construct and maintain drain ditches, and of mere regulations restraining the use or enjoyment of property or of a business, in other particulars. None of them deal with the "deprivation of property outright," or with a "destruction" of property, except such as is per se injurious or pernicious to public health, morals, general welfare, etc., such as intoxicating liquors, the manufacture, sale, use, or possession of which may absolutely be prohibited, or other property which per se is injurious and pernicious and which may also be absolutely abated or the use,

possession, or maintenance of it prohibited, or cases such as involving the destruction of buildings to prevent a spread of conflagrations or other menaces to public safety. Outside of such and similar instances, the cited cases do not support the broad statement of the text that one, under exerted police powers, may be "outright deprived of his property," or his property destroyed, without compensation, or without due process of law other than by an exerted power of a police measure.

In 6 R. C. L. 196, the author, in considering the police power, among other things says:

"Accordingly it is an established principle that the constitutional guaranty of the right of property protects it not only from confiscation by legislative edicts, but also from any unjustifiable impairment or abridgment of this right. The constitutional guaranty that no person shall be deprived of his property without due process of law may be violated without the physical taking of property for public or private use. Its capability for enjoyment and adaptability to some use are essential characteristics and attributes without which property cannot be conceived. Hence a law is considered as being a deprivation of property within the meaning of this constitutional guaranty if it deprives an owner of one of the essential attributes, or destroys its value, or restricts or interrupts its common, necessary or profitable use, or hampers the owner in the application of it to the purpose of trade, or imposes conditions upon the right to hold or use it, and thereby seriously impairs its value."

Cases are there cited in support of the text.

Timely observations were made by Mr. Justice Marshall in the case of *State* v. *Redmon,* 134 Wis. 89, 114 N. W. 137, 139, 14 L. R. A. (N. S.) 229, 126 Am. St. Rep. 1003, 15 Ann. Cas. 408, that:

"The idea is found expressed now and then, that the police power is something not dealt with or affected by the Constitution, at least in any marked degree, which is a mistake hardly excusable. The error suggested here and there, that the police power is 'a sovereign power in the state, to be exercised by the legislature, which is outside, and in a sense above, the Constitution (*Donnelly* v. *Decker,* 58 Wis. 461, 17 N. W. 389, 46 Am. Rep. 637), and that a police regulation which is clearly a violation of express constitutional inhibition is legitimate, subject to a judicial test as to reasonableness * * * (Tiedeman, State

and Federal Control, § 3), or that no police regulation, not condemned by some express constitutional prohibition, is illegitimate, or that legislation not so condemned is legitimate if the law-making power so wills, though it violates some fundamental principles of justice, or that the reasonableness of a police regulation, and whether it unjustly deprives the citizen of natural rights, is wholly of legislative concern (*Hedderich* v. *State*, 101 Ind. 564, 1 N. E. 47, 51 Am. Rep. 768), and others of a similar character now and then found in legal opinions and textbooks, are highly misleading' and have been distinctly discarded by this court. *State ex rel. Milwaukee Med. College* v. *Chittenden*, supra [127 Wis. 468-521, 107 N. W. 500]. * * *

"The idea that all legislation is within the police power which the law-making authority determines to be so, and that all which might be within such power is within it if the Legislature so determines is, as we have seen, a heresy, and one which was repudiated sufficient for all time by the early decision, heretofore referred to, in *Marbury* v. *Madison*, supra [1 Cranch, 137, 2 L. Ed. 60], the American classic which first and conclusively declined the general character of the constitutional limitations and the relations of the Legislature and the judiciary thereto and to each other. The doctrine there laid down more than a century ago in the unanswerable logic of Chief Justice Marshall has never been departed from, except accidentally, inconsiderately or ignorantly."

Here the city constructed an open intake, without any protection or barriers whatever, below the foothills and near the east boundary of the corporate limits and near the west boundary of the grazing lands. It could have constructed a reasonably proper and protected intake a mile and a half or more farther up the stream, and from there piped the water to its reservoir, and thus avoided much, if not all, of the pollutions complained of. The only apparent reason it did not do so was to avoid expense. At least it was less expensive to construct the intake where it did and from which place it carried the water to its reservoir a distance of about or less than a half mile. Let it be assumed the city had the lawful right to construct its intake at any place along the stream, even where it courses through the valley and where the greater part of its waters are used for irrigation and for watering live stock feeding and grazing on lands through which the stream flows, and

in the exercise of its police power the city could restrain the use and enjoyment of lands abutting and adjacent to the stream for a distance of 300 feet therefrom. If such restraint but inconvenienced owners in the use and enjoyment of their lands and premises, or created some loss or injury to them, let it further be assumed they could not complain. But if such restraint wholly deprived them from any and all profitable use and enjoyment of their lands and premises, it hardly may be contended that such a result could be accomplished without compensation. The case in hand is but in degree different. While every owner or occupant must so use his property as not to unreasonably or unnecessarily injure others, so, too, must the municipality, in the exercise of its police power, so exercise it as not to unnecessarily or unreasonably or arbitrarily injure rights of others in and to property or a business not itself injurious or pernicious. For aught that appears there is no good reason why the city at a comparatively small additional expense could not have constructed its intake higher up the stream and from there piped its water to its reservoir. The lands, the seventy-two acres, of which the defendants are deprived, apparently are not of great value, probably not to exceed $750 or $1,000. If less expensive to condemn than to construct an intake higher up the stream, such course was available to the city. To yield obedience to the decree forbidding the defendants under any and all circumstances grazing their animals on any part of the 300-foot limit and from allowing their animals under any and all circumstances to drink from the creek or from any tributary thereof requires them, if they graze their animals on other portions of their lands adjoining or adjacent to the 300-foot limit, to fence off the restricted area for the distance the creek runs through their lands, and though such fences be erected, yet, on the undisputed facts that the lands are suitable only for grazing purposes, the defendants would still be deprived of all profitable use of the lands so inclosed or fenced off.

Thus, in so far as the decree restrains the defendants from corralling or bedding or holding their goats or other live stock within the 300-foot limit above the intake of the city, from suffering or permitting any dead animals to be in or near the creek or any tributary thereof whether within the 300-foot limit or beyond it, from in any manner unnecessarily or unreasonably or negligently so using their premises as to cause dung from animals or other refuse to be cast or washed into the creek and which in the exercise of all reasonable care and caution may be avoided or prevented, from suffering or permitting any of their animals above the city's intake to drink directly from the creek or any of its sources of supply, and which in the exercise of all reasonable care and caution may be avoided and prevented, and from in any manner polluting or contaminating any of the waters of the creek or of any of its sources of supply, which, in the making of a proper, reasonable, and necessary use of the lands, and in the exercise of all reasonable care and caution may be avoided and prevented, the judgment is affirmed. In so far as the decree, without compensation, restrains the defendants from grazing their lands within the 300-foot limit under any and all circumstances, though in so doing the defendants do not make any unreasonable, unnecessary, or negligent use of their lands and use all reasonable care and caution to avoid or prevent any pollution or contamination of the waters of the creek or of any of its sources of supply, the judgment is reversed. Such a direction is, as we think, in accordance with the principle or rule announced in the case of *Salt Lake City* v. *Young*, supra, and which without modification or disapproval has been the announced rule in this jurisdiction for more than fifteen years. We see no good reason now to depart from it.

The case hence is remanded for further proceedings in accordance with the views herein expressed. Costs to the appellants.

ELIAS HANSEN and EPHRAIM HANSON, JJ., concur.

FOLLAND, J.

I concur. I am satisfied that the legislative enactments and city ordinance in question were enacted within the proper exercise of the police power and are not violative of any provision of the state or federal Constitution. These do not prohibit all and every use of the land of appellants nor of the land within 300 feet of the stream nor prevent the grazing of such lands by goats or other animals where the proper precautions are taken to prevent pollution of the waters of the stream. The decree of the court goes further and is broader in its scope than the statutes and ordinances and enjoins all use by means of grazing by animals of the lands within 300 feet of the creek. The opinion of the court therefore rightly sustains that portion of the decree which is in harmony with the statutes and ordinances and strikes down that part which goes beyond. It is the decree and not the statutes or ordinances which come in conflict with the rights of appellants referred to in the main opinion. Such a use of the premises or befouling the waters of Stone creek as are condemned by Comp. Laws Utah 1917, § 8184, as amended by chapter 3, Laws Utah 1927, are forbidden and enjoined by the decree. The city ordinance of Bountiful City prohibits the watering of animals directly from the stream as well as the permitting of animals to remain in or near or to pollute any such stream. This language has been construed by Mr. Justice Frick in *Salt Lake City* v. *Young*, 45 Utah 349, 145 P. 1047, 1050, Ann. Cas. 1917D, 1085, and need not be repeated here. The decree as affirmed enjoins such conduct by appellants. The ordinance also prohibits any loose animals to run at large within 300 feet of the stream. This, however, does not mean that the land may not be used at all for grazing within such area. If the animals are herded or controlled in such manner that they may not get into the water or deposit their feces in or so near the stream as to pollute the waters or be washed by natural causes into the stream, there is no restriction in the ordinance upon such use. The phrase "running at

large" as applied to animals means strolling about without restraint or confinement, roving or rambling at will. 1 Words and Phrases, First Series, p. 605. It is the uncontrolled and unrestrained roving of animals within a 300-foot area which is denounced by the ordinance. There is a reasonable use of the lands within this area which is not prohibited by ordinance and will not be enjoined by the decree directed to be entered by this court. I use the words "reasonable use" in the sense as defined by Mr. Justice Frick in *Salt Lake City* v. *Young,* supra:

"Therefore, whenever in this opinion I refer to a 'reasonable use,' I refer to one which is not of itself a nuisance or which does not unnecessarily and appreciably pollute the waters of a stream. Further, that if in using property a stream is necessarily polluted and such pollution can be avoided without destroying the owner's ability to use the property, he must take reasonable steps and precautions to avoid such pollution, and, if he willfully or negligently fails to do so, he may be punished for his acts. Any use which results in an appreciable pollution which is preventable by incurring reasonable expense or making reasonable effort cannot be deemed a reasonable use for the purpose of withstanding the enforcement of a police regulation which is intended to protect the public health."

I am, however, unable to agree wholly with what is said in the main opinion as to limitations upon the exercise of the police power. This power depends upon, and is limited by, its relation to the health, safety, morals, and general welfare of the public, and may go so far under certain conditions as to entirely deprive the owner of a specified use of his property where such use is inimical to the health and welfare of the public, and such power, by its rightful exercise, is not limited because burdensome to individual property owners nor by the fact that the use now prohibited has heretofore been a lawful and proper use. There is a limitation upon the power that it cannot be exerted arbitrarily or with unjust discrimination. In this case the property is not in fact by the ordinance taken for public use without compensation. Its use, however, by the owner, is limited so that the public health may not be impaired by

the acts specified in the regulation. The distinction between the application of the police power and that of eminent domain to private property is clearly stated by Mr. Justice Harlan in *Mugler* v. *Kansas*, 123 U. S. 623, 8 S. Ct. 273, 301, 31 L. Ed. 205, as follows:

"As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. Nor can legislation of that character come within the fourteenth amendment, in any case, unless is is apparent that its real object is not to protect the community, or to promote the general well-being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. The power which the states have of prohibiting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner."

Legislation such as we are here dealing with is not objectionable because in some instances it may restrain the profitable use of private property when such use does not directly injure the public in health or comfort. Such measures are designed to be preventative and to be effective must be able to restrain acts which tend to produce public injury. One of the most obvious concerns of the state is

the health of its individual members. The pollution of the sources of a public water supply is extremely dangerous to the health and welfare of any community, and the Legislature may, in the exercise of the police power, restrain a use of private property which has a reasonable tendency to cause such pollution, and, to be valid, the measures thus taken need not actually wait and reach pollution only after it has in fact occurred. *State* v. *Wheeler*, 44 N. J. Law, 88.

To sustain legislation under the police power, the courts must be able to see that its operation bears a reasonable relation to the public purpose sought to be accomplished. The Legislature has a large discretion, which, if exercised bona fide, for the protection of the public and the means employed have a real and substantial relation to the purpose intended, is beyond the reach of judicial inquiry, and, as stated by Mr. Justice Stone in the recent case of *Standard Oil Co.* v. *Marysville*, 279 U. S. 582, 49 S. Ct. 430, 73 L. Ed. 856:

"We need not labor the point, long settled, that, where legislative action is within the scope of the police power, fairly debatable questions as to its reasonableness, wisdom, and propriety are not for the determination of courts, but for that of the legislative body on which rests the duty and responsibility of decision." (Citing many cases.)

The scope of the police power has been well stated by Mr. Justice Powers in *State* v. *Quattropani*, 99 Vt. 360, 133 A. 352, 353, as follows:

"The police power in its broadest significance is but another name for sovereignty itself. *In re Guerra*, 94 Vt. 1, 110 A. 224, 10 A. L. R. 1560. In its narrower sense, as here exercised, it signifies the governmental power of conserving and safeguarding the public safety, health, and welfare. In this sense, it covers a very wide field of operation. All contracts entered into, all charters granted, all rights possessed, and all property held, are subject to its proper exercise, and must submit to its valid regulations and restrictions. *Waterbury* v. *Central Vt. Ry. Co.*, 93 Vt. 461, 108 A. 423; *State* v. *Speyer*, 67 Vt. 502, 32 A. 476, 29 L. R. A. 573, 48 Am. St. Rep. 832; *State* v. *Morse*, supra [84 Vt. 387, 80 A. 189, 34 L. R. A. (N. S.) 190, Ann. Cas. 1913B, 218]. Its scope, however, is not unlimited and the validity of any mandate promulgated under it is for judicial deter-

mination. *State* v. *Morse*, supra; *State* v. *Haskell*, 84 Vt. 429, 79 A. 852, 34 L. R. A. (N. S.) 286. The necessity and propriety of the mandate are for the Legislature or its delegate; its character whether valid or otherwise, is for the court. *State* v. *Speyer*, supra. This order is presumptively valid (State v. Morse, supra), and it must be enforced unless it is made manifest that it has no just relation to public health protection, or that it is a plain palpable invasion of constitutional rights, *Board of Health* v. *St. Johnsbury*, 82 Vt. 276, 73 A. 581, 23 L. R. A. (N. S.) 766, 18 Ann. Cas. 496; *Purity Extract & T. Co.* v. *Lynch*, 226 U. S. 192, 33 S. Ct. 44, 57 L. Ed. 184. If either of these infirmities appear, it is our duty to declare its invalidity."

The legislation by statute and by the city ordinance questioned in the instant case bears a direct and substantial relation to the public health and welfare, and there is not such a plain and palpable invasion of constitutional rights as would justify us in saying that such regulation or restriction is invalid.

CHERRY, C. J.

I concur in the views expressed by Mr. Justice FOLLAND.